**SCHEIB v. UNITED STATES, and eleven other cases.***

(Circuit Court of Appeals, Seventh Circuit. March 11, 1926. Rehearing Denied May 20 and September 18, 1926.)

Nos. 3578–3589.

**1. Conspiracy ☞32—Post office ☞35(10).**

Scheme alleged in indictment for conspiracy and using mails to defraud, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), as to selling mortgage company stock at prices in excess of its value, *held* sufficiently definite, and to constitute fraudulent scheme contemplated by statute.

**2. Indictment and information ☞125(5½).**

Indictment under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), alleging general purpose of inducing persons to buy or exchange for mortgage company stock at prices in excess of its value, *held* not defective, as charging plurality of schemes, artifices, or conspiracies.

**3. Conspiracy ☞43(9)—Post office ☞48(4).**

In prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for scheme to defraud in sale of mortgage company stock by use of mails, it is not necessary that indictment set out or describe letters charged to have been mailed.

**4. Criminal law ☞1170(2).**

Refusal to admit letters in evidence *held* not reversible error, where substance of contents was otherwise before jury without contradiction.

**5. Criminal law ☞829(3).**

Instruction, in prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for scheme to defraud in sale of mortgage company stock by use of mails, that if acts were done with innocent motives, or without unlawful intent, defendant should be acquitted, *held* properly refused, in view of other instructions embodying such proposition.

**6. Criminal law ☞776(5).**

Refusal, in prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), to give instruction that character testimony might in itself produce reasonable doubt of defendant's guilt, requiring acquittal, *held* proper.

**7. Criminal law ☞783(1).**

Where district attorney, in cross-examination of character witnesses, read affidavit of one of defendants making accusations against others, instruction limiting application as against any defendants except affiant *held* to cover all defendants, since language was not restricted.

**8. Conspiracy ☞47—Post office ☞49.**

In prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for fraudulent scheme to sell mortgage company stock by use of mails, evidence *held* sufficient to sustain conviction as to some of defendants, and insufficient as to others.

In Error to the District Court of the United States for the District of Indiana.

*Certiorari denied 47 S. Ct. 95, 71 L. Ed. —.

Anthony A. Scheib, Carl B. Anderson, William M. Webb, William Sacks, Harry J. Bovard, Mord Carter, William M. Jones, James W. McCallum, Frank J. Haight, Frank C. Willis, Abraham R. Sax, and Frank B. Jaqua were convicted of violation of Criminal Code, §§ 37, 215, and they separately bring error. Affirmed, except as to defendants William Sacks, Frank C. Willis, and Frank J. Haight, and as to them reversed and remanded for new trial.

See, also, 15 F.(2d) —.

A. R. Russell, of St. Louis, Mo., for plaintiff in error Scheib.

John F. Robbins, of Indianapolis, Ind., for plaintiff in error Anderson.

Robert C. Merritt, of Dallas, Tex., for plaintiff in error Webb.

Patrick H. Cullen, of St. Louis, Mo., for plaintiff in error Sacks.

Luther Day, of Cleveland, Ohio, for plaintiff in error Bovard.

Floyd J. Mattice, of Indianapolis, Ind., for plaintiffs in error Carter and McCallum.

Frederick Van Nuys, of Indianapolis, Ind., for plaintiff in error Jones.

Martin M. Hugg, of Indianapolis, Ind., for plaintiffs in error Haight and Willis.

Benjamin P. Epstein, of Chicago, Ill., for plaintiff in error Sax.

Cassius C. Shirley, of Indianapolis, Ind., for plaintiff in error Jaqua.

Homer Elliott, of Indianapolis, Ind., for the United States.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. 1. Plaintiffs in error, 12 in number, with 7 others, were together indicted, charged with violation of sections 215 and 37 of the federal Criminal Code (Comp. St. §§ 10201, 10385). Sebring, one of the defendants, died before trial. Hawkins and Sapp defaulted and not tried. Two of them, Succop and Clark, were acquitted. The rest were convicted. Two of these, Sutton and Harrington, accepted the penalty, which, in their cases, was a fine only. Defendants Scheib, Bovard, Webb, Sacks, Carter, and Jones were each sentenced to five years' imprisonment and $2,000 fine; Haight, Willis and Jaqua, each two years' imprisonment and $2,000 fine; and defendants Anderson, McCallum, and Sax one year. The verdict was general, and the penalties imposed were upon each of the 16 counts, to run concurrently. The indictment is voluminous—132 pages of the printed record. Each of the first 15 counts alleges the same

scheme to defraud, charging in each a separate use of the mails in its execution.

[1] Briefly stated, the fraudulent scheme charged had for its object selling to the public capital stock of the Hawkins Mortgage Company and of its subsidiaries, various so-called welfare loan societies, at prices vastly in excess of their value; that the defendants were to falsely represent to the intended victims that the shares of stock would yield large dividends, and be of large and increasing value, and that the business was being profitably conducted; the fact being that defendants knew the stocks had little or no value, that the fixed sale prices were fictitious, and that the corporate business was being conducted at large and growing annual loss. That they would falsely represent that preferred stock in the welfare societies would be a safe and profitable investment, and that the Hawkins Mortgage Company, with its $9,000,000 of assets, would stand back of each welfare society; the defendants well knowing that the Hawkins Company did not have $9,000,000, or anywhere near that amount, in assets, and that it was not in fact back of the welfare societies, but was drawing large amounts from them, and thus reducing what assets they had. That the defendants would cause the Hawkins Mortgage Company to purchase or otherwise obtain control of other mortgage and loan companies which were supposed to be in trouble, but which had assets of value, and would enter into arrangements whereby the Hawkins Mortgage Company would control the board of directors of such other companies, and through false representations as to the value of the stock of the Hawkins Mortgage Company induce those who held stock or contract interests in such other mortgage and loan companies to exchange same for stock of the Hawkins Mortgage Company. And the defendants should falsely represent to the holders of stock and other interests in such other mortgage or loan companies that thereafter those companies could not profitably operate, and urging that such stock or other interests could and should be exchanged at par for stock in the Hawkins Mortgage Company; that the Hawkins Mortgage Company and its predecessors had been in honorable and successful business of generally similar nature for nearly 100 years, and that its assets were more than $9,000,-000, and paid-up capital and surplus and undivided profits were more than $2,000,000; that such representations were known by the defendants to be untrue, and that they intended thus to possess themselves of the as-

sets of such other mortgage and loan companies by exchanging therefor stock of the Hawkins Mortgage Company, which had little or no value. That these defendants would devise for circulation a so-called "guaranty bond" of the Hawkins Mortgage Company, wherein it should be falsely represented that the bond secured to holders of preferred stock of the welfare societies payment of substantial dividends thereon, and would refer to such bonds in the company's literature for the purpose of inducing the public to buy preferred stock of the welfare companies, but that the defendants knew the Hawkins Mortgage Company would not and did not intend to advance such dividends, but, on the contrary, would withhold from the societies a part of their funds as dividends, and thus make it appear that the Hawkins Company out of its own funds was paying the guaranteed dividends, all for the purpose of fraudulently inducing others to buy stock of the welfare societies.

That there should be organized a concern known as the Cincinnati Bond & Investment Company, in control of some of the defendants, and that such bond and investment company would circulate literature from which the public should conclude that it was an independent concern, and had investigated the Hawkins Mortgage Company and found it to be a sound concern, in which every investment would be secured; the object being to produce in the intended victims the belief that this independent company was giving its good faith judgment upon the security afforded by investment in the stock, in order to stimulate the public to buy more of it, whereas the defendants knew that the Cincinnati Bond & Investment Company was but an instrument of the Hawkins Mortgage Company, created only for the purpose of falsely and fraudulently influencing the public to buy the stock of the Hawkins Mortgage Company and of the welfare societies. That defendants would falsely represent that they created a "pool" of common stock of Hawkins Mortgage Company, in order to build up and protect the market for the Hawkins Mortgage Company stock, and increase its selling price, and should represent that funds of widows and orphans would be absolutely protected from loss, and that the Hawkins Mortgage Company would protect the stockholders, and stand back of the welfare societies, whose stockholders would have the double protection of the welfare society itself and the Hawkins Mortgage Company bond guaranteeing the safety of the money invested, which would be further secured by

all the loans made by the welfare societies, and that dividends would be regularly paid on the welfare society stock to the extent of 8 per cent. in each; that all such representations and statements defendants knew to be false. That the defendants, under the pretense of salaries, loans, bonuses, commissions, and drawing accounts, would convert to their own use whatever was paid in by their intended victims in consideration for their purchase of the aforesaid stock.

Each of the 15 counts concludes with an allegation that, for the purpose of executing the alleged scheme, the defendants, on the date and at place named, deposited in the United States post office for transmission to the addressee, a letter contained in an envelope, the address whereon is set forth, but no further description is made of the letter. The sixteenth count charges a conspiracy to violate section 215 of the Criminal Code, through the defendants' conspiring and combining to form a fraudulent scheme, such as is set out in the previous counts, and to make unlawful use of the United States post office establishment in the execution of such scheme. A large number of overt acts are charged as being in furtherance of the alleged conspiracy.

2. There is plainly nothing in the contention that the scheme alleged is not sufficiently definite, or does not constitute such a fraudulent scheme as is contemplated by the statute.

[2] It is contended that all the counts are defective, in that each of them charges a plurality of schemes, artifices, or conspiracies. We do not regard them as properly subject to this objection. The general purpose of inducing persons to buy or exchange for stock of the Hawkins Mortgage Company and of the welfare societies, to the distinct disadvantage of such persons, runs through the entire indictment. Surely each separately alleged manifestation of the same general purpose to defraud the public does not constitute a distinct scheme or artifice, but is only a detail in the general plan to induce persons to part with money or other valuable thing in exchange for the practically valueless stock. The unity of the alleged scheme or artifice to defraud sufficiently appears from the indictment, and the various means to that end which the indictment charges do not in and of themselves constitute allegations of separate schemes, artifices, or conspiracies.

[3] The first 15 counts are attacked, because they do not set out or describe the letters charged to have been mailed. It is urged that, unless the letter itself is set out, one might not be able to defend against a second prosecution for the mailing of the same letter. But practically the danger is not apparent. In the first prosecution the letter would have to be produced, as well as evidence to connect it with the fraudulent scheme. On a second prosecution it might be shown by evidence whether the letter then relied on was the same as that which was the subject of the first prosecution.

But there is the further suggestion that, if the letter is not set forth in the indictment, the identity of the letter offered in evidence with that on which the indictment was found may not appear. Presumably the grand jury did not return the indictment without evidence of the mailing of the particular letter whereon the count is based, and of the connection of the letter with the scheme. The contention is at least plausible that, to avoid question of the identity of the letter offered in evidence on the trial with that which was before the grand jury, the indictment should in some way definitely identify the letter. Of the advisability thereof there can be no question, and considerations of brevity alone do not excuse the omission. If we deemed the question to be an open one, it might have our further consideration, but in Durland v. United States, 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709, under a similar state of facts, the Supreme Court said:

"It may be conceded that the indictment would be more satisfactory, if it gave more full information as to the contents or import of these letters, so that upon its face it would be apparent that they were calculated or designed to aid in carrying into execution the scheme to defraud. But still we think that as it stands it must be held to be sufficient. There was a partial identification of the letters by the time and place of mailing, and the charge was that defendant 'intending in and for executing such scheme and artifice to defraud and attempting so to do, placed and caused to be placed in the post office,' etc. This, it will be noticed, is substantially the language of the statute. If defendant had desired further specification and identification he could have secured it by demanding a bill of particulars. Rosen v. United States, 161 U. S. 29 [16 S. Ct. 434, 40 L. Ed. 606]."

It is true in that case mention is made of the fact that the question there was not raised by the demurrer, but on motion to quash, whereon the action of the district court is generally discretionary. Nevertheless the rule as enunciated is not qualified, and we consider it binding upon us. It has

been followed by other Circuit Courts of Appeals. Hume v. United States, 118 F. 689, 55 C. C. A. 407 (Fifth); Wilson v. United States, 275 F. 307; Garvey v. United States 4 F.(2d) 974. But, even if this question were determined in favor of plaintiffs in error, it would not affect the judgments, so far as they rest on count 16 for conspiracy.

3. Complaint is made of the denial of motions for severance presented by two of the defendants. The reasons stated in support of the motion were such as fall within the court's general discretion to grant or refuse severance. Ball v. United States, 163 U. S. 662, 16 S. Ct. 1192, 41 L. Ed. 300; Oppenheim v. United States, 241 F. 625, 154 C. C. A. 383. Abuse of the discretion does not here appear. .

[4] 4. Of the many errors assigned, we find but one as to rulings on admissibility of evidence, that of Carter to the rejection of Exhibits 654 and 655, one of which was a letter from one Arvin to him, and the other an agreement between him and Arvin, all with reference to the sale to the Hawkins Mortgage Company of Indiana Rural Credits Association stock. While it probably would not have been erroneous, and perhaps even better, to have admitted these, we can see no substantial harm in their rejection. The substance of what was in them was otherwise before the jury without contradiction, and the slight impropriety, if any there was, in their rejection, does not rise to the dignity of reversible error.

[5] 5. The charge of the court was admittedly fair. No exception was taken, save as to failure to give requested instructions, of which about a hundred were submitted to the court. In the main they embodied the proposition, variously stated, that if the things, shown to have been done by the particular defendant for whom asked, were done with innocent motives, or without the intent to do the unlawful acts which the indictment alleges, a verdict of not guilty should be returned. This, of course, is not the language of the several requests, but their substantial purport. A very considerable part of the more than 1,500 pages of briefs is devoted to the discussion of these alleged errors.

Respecting many of the requests the government contends they do not accurately state the applicable law. While this may be true as to some or many of them, yet the real purpose of such a request is not that it be given in the precise language suggested, but that its salient feature be in some appropriate form included in the court's charge. It goes without saying that, if this was in ef-

fect done, there is no error in refusing the request. In any event, the court is surely not bound to charge in the form requested. If stated so that ordinarily intelligent men may reasonably be expected to comprehend it, particular words and phrases are not important.

It is apparent the alleged scheme to defraud by making false representations to sell stock was abundantly shown as charged, and the real question was as to which, if any, of the defendants on trial knowingly participated therein. The statutes were read and explained to the jury; they were told that the several defendants are presumed innocent, and should not be convicted unless the evidence convinced of guilt beyond reasonable doubt, and that any defendant respecting whom they entertained reasonable doubt of guilt under the evidence must be acquitted. It was stated: "But the evidence necessitates your directing your attention to determining which of the individuals here appears from the evidence to have been culpably connected with the scheme or with the conspiracy."

In reference to various groups of the defendants, the jury was charged in language such as this:

"Ask yourselves the fundamental question that is involved here: What was their connection with this matter? What knowledge had they, if any, of what was going on? What participation do you find the evidence discloses that they, or any one of them, had, in devising, maintaining, or in executing, or in aiding or abetting, counseling, or assisting in and with respect to this scheme to defraud?

"And in that situation it is well for you to scrutinize very closely the exact position which they, or any of them, at any time held, with a view of determining, not only the actual knowledge that the evidence here shows that they had, and their actual intent and actual animus, but also to aid you in determining their means of knowledge, the likelihood of their co-operating in carrying on the things which the evidence may satisfy you were carried on by somebody, for the purpose of accomplishing the end of the scheme, namely defrauding some one. * * *

"Ask yourselves the question as to what the evidence shows that they, at that time, knew, or had the means of knowing, and in fact did know, that bears upon the question as to whether they were entirely innocent and ignorant of the things that were sought to be accomplished, say by the Hawkins organization, or whether they were, in fact, not good faith participants in and contributors

toward the furtherance of the scheme to defraud. * * *"

As to another group it was said:

"Ask the same question with respect to them, * * * what they knew, what was disclosed to them at that time, as to the purpose and animus of the Hawkins organization, what their own purpose and animus was, in entering into the merger, at all, and, finally, whether, at that time, they innocently, ignorantly, and in good faith, and upon honest motives, or whether, at that time, they did and intended to co-operate and contribute towards the furtherance of the scheme to defraud. * * *

"What relations, if any, did either or any of these defendants sustain toward the organization that was carrying on the fraud, thereafter, and there, again, answer the question whether they were innocent, acted in good faith and upon honest motives, or whether they consciously, and in bad faith, contributed to and became aiders and abettors to the carrying on of a scheme to defraud."

It was not stated that, in case the jury concluded one way they should convict, and in the other acquit. But surely any juror with a grain of sense would know that to be the necessary purport. While it would have been entirely consistent and proper, and even advisable, to have elaborated somewhat further upon the particular issues toward which many of the requests were directed, and especially where, as here, many are on trial, and are connected with the scheme or conspiracy, if at all, in various ways, we are well assured that the essence of these requested propositions was sufficiently submitted to the jury, and that more specific reference thereto in all human probability would not have changed the result.

[6] 6. Some of the requested instructions were on behalf of certain of the plaintiffs in error as to whose previous good reputation witnesses had testified. The requests were to charge the jury in substance that such testimony might in itself produce reasonable doubt of the guilt of the defendant, in which case the jury should acquit such defendant. As to such evidence the jury was charged that "that evidence is properly received, and it is for you to consider with all the other evidence in the case, and give it such weight as you think it deserves." Adhering to the conclusion reached on a quite similar situation, which arose in Allen et al. v. United States (C. C. A.) 4 F.(2d) 688, we hold adversely to the contention of error in this respect.

[7] 7. In connection with the character testimony, it further appears that on cross-examination of certain of the character witnesses they were asked whether they were aware of an affidavit, previously filed in the state court by defendant Jaqua, in certain proceedings he had there instituted, wherein Jaqua made under oath certain accusations against the defendant in support of whose reputation the witness had testified. The district attorney would read to the witness the affidavit of Jaqua, which detailed alleged fraudulent conduct of that defendant with respect to practically the same matters charged in the indictment. The complaint is that the court did not give a requested charge to the jury to the effect that such affidavit did not constitute evidence of the fraudulent conduct against the defendant therein referred to. But it appears that, when the court's attention was challenged thereto, he said: "I attempted to cover that. I will give that instruction—that that complaint, of course, is not proof of the facts, as against anybody except Mr. Jaqua. * * * I attempted to tell the jury that such statements made by one person, concerning another, when the latter was not present, is not evidence against the absent person." It is complained that this language of the charge was used only with reference to a particular defendant, and not to all interested in it. But the language was not restricted, and manifestly was intended to cover all similarly situated.

[8] 8. The contention that there was error in the court's denial of motion to withdraw the case from the jury involves in its consideration some discussion of the evidence. That there was shown a fraudulent scheme to obtain by false representations money or its equivalent from those who would purchase or trade for stocks of the Hawkins corporations was freely conceded on behalf of most, if not all, plaintiffs in error, but each maintains he had no conscious part in the formulation or execution of the scheme. On behalf of most, if not all, of them it was freely asserted that Hawkins, then a fugitive, was the central, dominating, and responsible figure in this series of large stock operations, and that to the extent the others had part in his hectic stock-selling campaigns they were deceived by the same means as were effective in securing from the public millions of dollars for what turned out to be substantially worthless stock. But it would unduly tax credulity to believe that Hawkins alone could so long have carried on this widespread business without the aid

of able lieutenants, none of whom would be aware of its real nature.

Associated prominently with Hawkins in carrying it on were Scheib, vice president of the Hawkins Company, and intimately connected with its management and that of all the welfare societies, and very active in the acquirement of other corporations which were acquired, and who, indeed, of all the plaintiffs in error, is not urging that there appears no evidence of his conscious participation; Anderson, who almost from the first was a sort of general utility man for Hawkins, director in all his companies, member of the executive committee, treasurer, and assistant to the treasurer and to the president; Jaqua, vice president and general counsel; Sax, director of the sales or securities division for the Hawkins Company and the welfare societies; and McCallum, active in devising and circulating alluring and false literature for stimulating stock sales. The long and close relation of each of this group with the activities of Hawkins and his companies makes it difficult to understand how they could have remained in ignorance of the fraudulent methods employed to market the stock. The evidence connected Scheib and Anderson with almost every detail of the management—true, under general direction of Hawkins, but in such relation as quite inevitably to require the conclusion that they were aware of the improprieties wherein they had so large a part.

9. The connection of McCallum and Sax was more in the stock-selling department, and not of an official character, although the former did some of the time use the title "assistant treasurer." McCallum was an organizer of stock salesmen, and for much of the time, in 1921, 1922, and 1923, active in the stock-selling field. The evidence connected him particularly with the "market letter" scheme, an admittedly false device for making it appear to the public that the Cincinnati Bond & Investment Company was an independent company, whose officers gave out for publication extravagantly false representations respecting Hawkins and his companies, whereas the fact was that to McCallum's knowledge it was wholly a Hawkins concern.

While the evidence adduced against Sax, though wholly uncontradicted, is fragmentary and somewhat meager, we fail to find it such as will not sustain the verdict against him. It was testified that during part of the year or so that he was handling stocks of the Hawkins concerns he had a stock sales organization of about a dozen men, and that he was the director. Letter heads purporting to come from his office bore the name of the Hawkins Company, and the words "Securities Division, Indianapolis." One of such appeared, purporting to be signed by Sax, acknowledging receipt of $1,200 for stock in the Bedford Welfare Society, stating that the earnings of this company are above the average and a safe investment; whereas the evidence showed the company never reached the stage of transacting any business, although a few months after this stock was sold the owner was paid a small dividend upon it, and later was sent a dividend scrip. It does not appear that Sax personally made this or other sales of stock, nor was it affirmatively shown that Sax himself wrote or knew of this and another letter in evidence which bears his name; but with the other evidence of Sax's relation to the company we cannot conclude it was improper to admit these letters, to whose admission no objection was made, and there is no assignment of error upon them. There was some other evidence, oral and written, tending to show Sax's close business relations with Hawkins and his companies, of which likewise there is now complaint made, but without objection to admission, or assignment of error thereon appearing.

10. The insistence for Jaqua that he was merely counsel for the companies, and as such had no knowledge of the improprieties, might find more ready concurrence if it were not for his other relations with it, and for evidence which directly threw considerable light on the proposition of his good faith. His vice presidency and directorship is also to be considered. His personality and standing in the community were much employed to help inspire public confidence in the concerns, and to further sale of its stocks. His widespread exploitation as an advising factor in the Hawkins organization should have made him specially solicitous to see that he was not being used as a mere stalking horse to allure the public into the Hawkins trap, if in truth he was not aware of its real purposes. He had, it would seem, added interest and opportunity for knowing the truth, in that he was Hawkins' uncle, knowing him intimately from his boyhood. Apart from whatever presumption of fact might be drawn from personal and business connections, there was evidence that he knew the companies were running heavily behind from year to year, although they were paying dividends, the questionable practice of which must have been known to him as an old-time lawyer, and that

it continued to sell stocks upon the most fervid and lurid representations and predictions of large returns, as well as on the personal standing of Mr. Jaqua.

It further appears that in 1922, after his long connection with the company, he had a falling out with Hawkins, and filed in the Indiana state court his verified complaint, seeking a receiver for the Hawkins companies, stating in the complaint, inter alia, that "the defendant Morton S. Hawkins is now and has been for many years last past a professional schemer and promoter of dubious enterprises, to be foisted upon and financed by the investing public, designed wholly and solely to yield · large secret and unconscionable profits to him, the said Morton S. Hawkins," and alleging all manner of fraud on the part of Hawkins, Scheib, Anderson, Jones, and Carter in connection with the Hawkins companies. But, notwithstanding all this, some time afterwards his differences with Hawkins and his companies were composed, and he was again found employed by the company primarily to secure dismissal of bankruptcy proceedings which had been commenced against it, and for which he was to receive upwards of $20,000, of which he did in fact receive about $8,000. All these things the jury might, and doubtless did, consider in determining whether or not Jaqua's relation was purely that of counsel, in good faith serving the company, or whether in other capacities he was knowingly a factor in the fraudulent scheme to foist this stock upon the public. Respecting him and the four other plaintiffs in error mentioned in this connection, we cannot but conclude that the record sufficiently discloses evidence of guilty participation, so that we cannot say the verdict as to them finds no support in the record facts.

11. Jones and Carter became interested through a deal between the Hawkins Mortgage Company and the Indiana Rural Credits Association, the latter an Indiana corporation organized to loan money on real estate. It sold its stock and loaned its money on what was known as the amortization plan, taking real estate mortgage security. In July, 1922, Jones was its president and Carter a director, and it seems to have then had actual assets of about $2,000,000, whereof about $1,500,000 was in mortgages. Hawkins undertook to acquire the association, or rather its assets, and after negotiations his company made a contract, signed by Scheib for the Hawkins Company and Jones for the association, whereby the association agreed to sell the Hawkins Com-

· 14 F.(2d)—6

pany all its treasury stock, 9,113 shares, out of a total of its 20,000 shares, for $455,650, for which the Hawkins Company would give its note, secured by the stock purchased and by double the amount of Hawkins preferred 8 per cent. stock, and it was agreed that within a fixed time enough more Rural Credit stock was to be transferred to the Hawkins Company to give it a majority of the association stock, and that until the time this was done and the note was paid, the note and security was to be deposited with an escrow, for delivery when the conditions were complied with. The contract was executed and deposits made as agreed. Scheib, Hawkins, and Anderson became directors of the association with Jones and Carter. Afterwards, by consent of the officers of both corporations, the note and securities in escrow were delivered to the Hawkins Company, but without the note being paid. The Hawkins concern got control of the Rural Credits assets, and with the consent of Jones and Carter devoted a considerable part of the association mortgages to raise money which was partly used to pay dividends on Hawkins stock. For their part of the transaction Jones and Carter were each given a large block of Hawkins stock.

If their connection with the business had ceased with the transfer of the stock to the Hawkins Company, a different situation would be presented, even if in the transaction it might properly be charged that they had betrayed the association and its stockholders into a disadvantageous and even dishonest bargain. Both remained on the association board of directors until its assets were distributed and it ceased to function. Carter became a director of the Hawkins Mortgage Company. Both, but particularly Carter, became active in persuading association stockholders to exchange their stock for Hawkins stock and to buy more of the latter. By correspondence and personal solicitations they pictured the large and growing value and the dividend-paying qualities of the latter. There was evidence that, even before a majority of the association's stock was obtained, these men, in order to influence the association's stockholders to part with their stock in exchange for Hawkins stock, represented that already the Hawkins Company had secured a majority, evidently thereby intending by this materially false representation to induce in the minds of the association's stockholders the belief that it would be futile longer to hold out, and to induce exchanges for Hawkins stock which might not otherwise have been made. There was evi-

dence of their relations with Hawkins and his lieutenants of such duration and intimacy as, coupled with the other facts, shown, made it fairly a question for the jury whether or not they knowingly participated in the plan to procure by false and fraudulent representations association stockholders to buy or exchange for the Hawkins stock.

12. The connection of Sacks and Webb is through the United Home Builders of America, a voluntary Texas loan concern, operating as a so-called common-law trust, functioning under a trust agreement or declaration of trust by the trustees. Its business was to sell contracts whereon periodical payments would be made, and when a certain amount had been paid in the contract holder was eligible to borrow money on mortgage at 3 per cent. interest, and repay it by continued payments on the contract. The trust agreement provided for two trustees, who were to conduct the business, and who, in case of liquidation, after payment of all obligations of the concern under outstanding contracts and otherwise, would be the owners of whatever was remaining. Webb was one of the original organizers, and a trustee from the start.

There was also a corporation organized in connection with the Home Builders, with $25,000 capital stock, which was all owned by the trustees. It was testified without contradiction that in 1921 Sacks bought out Webb's cotrustee, paying him something over $100,000 in cash; that at the same time Webb had negotiated sale of his interest for the same amount, but that Sacks induced him to remain, and thenceforth they were the trustees. The concern was apparently prosperous, its assets at the time in question being upwards of $2,000,000, of which over three-fourths was in these loans, and its liabilities were such that there was a surplus, at least on paper, of about $300,000. In Texas a proceeding had been started for a receivership, because of an alleged lottery feature and mismanagement. The office was removed to St. Louis, where Sacks resided. It appears there was contemplated legislation for the purpose of preventing such concerns (of which there were a number) doing business. Hawkins appeared desirous of getting hold of such, and wrote a St. Louis broker that he would like to trade for some concerns of that kind, saying the authorities were stopping their operations, and stating in the letter, "If we can get next to the trustees of these companies, they would be pretty good propositions." The broker conferred with Sacks and Webb, and wired

Hawkins. There were negotiations which resulted, November 17, 1922, in the acceptance by Sacks and Webb of Hawkins' proposition to purchase the entire interest of Sacks and Webb as trustees and stockholders for $300,000. For Webb's share it was agreed to deliver him certain Arkansas mortgages for $85,000 and a note of the Hawkins Company for $65,000, due in four years, secured by Hawkins Mortgage Company preferred stock of equal amount at par; for Sacks' half there was to be a note to him of Hawkins Mortgage Company for $100,000, due in four years, secured by Hawkins Company preferred stock of equal amount at par, another note of $25,000 due in six months, likewise secured, and Hawkins Company to assume payment of a note of $25,000 on which Sacks was liable. It was provided that upon the $100,000 note should be applied 50 per cent. of the proceeds of the first liquidation (meaning, probably, liquidation of Home Builders assets). The agreement provided that, upon acceptance of the contract, Sacks and Webb would resign as trustees, and that Hawkins and Scheib should be installed in their stead. Sacks and Webb immediately resigned as trustees, and were succeeded by Hawkins and Scheib, and of the former it is said in the government's brief, referring to this stage of the proceeding, "Mr. Sacks dropped out of sight, and did not reappear until the indictment in this case."

In all these facts we see nothing to connect Sacks with any plan to defraud prospective buyers of the Hawkins stocks. While it was testified by the broker that Sacks knew Hawkins intended to get Home Builders contract holders to take for their contracts stock or contracts with the Hawkins Company, there is surely nothing in this that would implicate Sacks in an undertaking to defraud these stockholders. If there is any significance in that part of Hawkins' proposition that Sacks and Webb should do all in their power to install and keep in office the new trustees, and to co-operate with them in every possible way, it does not appear that Sacks did a thing to this end, save only to resign. The trustees had the undoubted right to sell, and so far as they were concerned Hawkins had the right to buy. Besides, Sacks is not indicted for selling out as trustee, and, whether the amount he was to have for his interest was large or small, it did not itself affect the contract holders, since all that was sold was the interest of the trustees, which, under the agreements, was in any event subordinate to the interest of the contract holders.

It cannot be seriously contended that Sacks knew of the financial condition of the Hawkins concern. He was shown the same flamboyant literature which had inveigled others into making investments in Hawkins stock, but which perhaps ought to have made him suspicious of it. He was shown the flattering recommendations of Hawkins and his concern, and made some personal investigation. It seems the entire consideration he was to receive for his interest, which had cost him so dearly, was bottomed on the security afforded by the collateral of Hawkins stock. In all this there is nothing tangible to suggest that he was scheming to defraud his people, by putting upon them valueless Hawkins stock. While the contract provided that 50 per cent. of the conversion was to be applied on the four-year $100,000 note until it was paid, the evidence does not disclose that after he ceased to be a trustee he undertook in any way directly or indirectly to bring about conversion of Home Builders contracts, or in any manner to have them exchanged for Hawkins stock. On the contrary, as stated in the government's brief, he did simply nothing, and, incidentally, with the result that the entire contracted consideration for his interest became lost to him. In vain we have searched the record for facts or circumstances tending to show on the part of Sacks the criminal conduct wherewith he was charged.

13. The situation of Webb up to the time of his resignation as trustee is like that of Sacks. But his relation with the Hawkins concern did not end then. The new trustees at once transferred the headquarters of the Home Builders from St. Louis to the seat of the Hawkins operations at Portland, Ind., and Webb was employed at large salary to influence holders of Home Builders contracts to exchange them for Hawkins stock, and this he vigorously pursued for several months, until shortly before the Hawkins concerns ceased doing business. He supplied the contract holders with the same sort of inflammatory literature as the Hawkins people habitually employed, supplementing it with his own correspondence, and predictions of great future for Hawkins stock, and expressions of fear respecting the future of Home Builders contracts. It appears from the correspondence that rumors derogatory to the Hawkins concern were reaching him, but he continued in his effort to make exchanges of stock, protesting in his evidence that he had assured himself that the rumors were groundless. While not so deeply implicated as McCallum and Sax in his stock-selling participation, we think he fairly falls in their class. We cannot conclude that the record is devoid of incriminating evidence in support of the jury's verdict against him.

14. Bovard's relation is in many respects quite similar to that of Webb. He was one of the trustees of the Co-operative League of America, likewise a voluntary common-law trust, loaning money to its members in practically the same manner as the Home Builders. Its trust agreement vested title and control of the trust funds in three trustees, chosen by and from those who held so-called series A contracts, of which there were then in amount outstanding about $5,500 in the hands of Bovard and nine others, including defendants Succop and Clark, who were acquitted. The same broker, who brought together Hawkins and the United Home Builders, at the same time and place brought together Hawkins and Bovard, and the negotiations were conducted about the same time.

The outcome of the negotiations with Bovard was a proposition by Hawkins that Bovard procure for Hawkins the interest of the trustees of the League for $68,530, it being stated: "It is our intention and purpose to exchange common shares of Hawkins Mortgage Company at the price of $65 per share, the same being of nominal par value, for the rights of contract in the Co-operative League of America, and it is understood and agreed that the principal consideration for said payment of $68,530 is your promise and agreement to aid and assist us in making such exchange of securities for contract holders' rights therein." Bovard accepted, and got all the other series A holders to enter into an agreement with Hawkins, Anderson, and Scheib to convey their holdings. This agreement did not refer to the $68,530; indeed, Bovard admitted that his associates did not know about it, but that he retained $40,000 for himself and distributed the rest among them. Pursuant to the last agreement, series A was transferred, the old trustees resigned, and Hawkins, Scheib, and Anderson became the trustees.

The new trustees transferred the institution to Portland, Ind., where Bovard was then employed to induce the many holders of contracts to exchange their contracts for Hawkins stock. The first act after the transfer was a joint letter of Bovard and Webb to the contract holders of both concerns, wherein they assume to write "as managing officers of the two largest home building trusts in America," giving reasons wherefor an exchange of the contracts for Hawkins stock was desirable, and urging prompt acceptance

of the Hawkins offer of exchange; and thereafter he diligently wrought among the contract holders to bring about exchange in very much the same way and under very much the same circumstances as did Webb. He also helped Hawkins to acquire another such organization, for which service Hawkins paid him $6,500. He continued in this work until the middle of May, when a receiver for the Co-operative League was appointed. But he worked with little success, since less than 25 per cent. would exchange. But he employed the same means as the others to bring them into line. He, like the others in similar situation, said he made diligent inquiry, both before and after entering into the agreement, and satisfied himself that the Hawkins outfit was responsible, and the stock worth approximately what was asked for it. So here again arises the question of whether there was evidence from which the jury might conclude he was aware of the fraudulent nature of the Hawkins proposition, or the falsity of the representations he was making to sell the stock.

To one now considering the extravagant representations and impossible predictions made to sell this stock, it would seem quite inconceivable that they could have been made in good faith, although true it is that many persons were sufficiently impressed to invest. Whatever we might now think we would have done, if serving on the jury, we cannot usurp the jury's functions; and where, as it here appears, men of experience and intelligence were employing palpably false and unfounded means for selling or exchanging for at preposterously high prices valueless stock, making use of the mails to that end, we cannot say, as a matter of law, there was no evidence to warrant a verdict against them.

14. Willis and Haight were connected only as public accountants, residing at Indianapolis, and employed in 1922 to make an audit for the Hawkins Mortgage Company. The contention against them is, in short, as stated in the government's brief, that "the Haight and Willis audit contained a balance sheet or statement of assets and liabilities which placed the welfare stock held by the Hawkins Company at $7,223,551.66, and the surplus and undivided profits at $441,242.-87½"; that "this was a fraudulent audit, since the welfare stock had little value and there was a deficit instead of a surplus, and that all this was shown by the books and readily available to the experienced accountant." They were employed in May to make the audit as of May 31, and to prepare

also a statement of income and disbursements for the first five months of 1922. For them it is contended that they did not undertake to make an appraisal of assets, but an audit of the company's affairs only as appears from its books and records; in other words, not an audit of the company, but of its books and records.

Apart from the oral testimony bearing on their employment, as to which there is no contradiction, the reports as submitted tend strongly to bear out their contention.. Their letter of October 23, transmitting the reports of the audit, states: "Pursuant to your authorization an audit as of May 31 of the books and records of the Hawkins Mortgage Company has been made, and herewith is submitted part 1 of the report, a statement of the assets and liabilities found to exist on that date, and a statement of income and disbursements for the first five months of 1922." Under same date, with submission of part 2, it was stated: "Herewith is submitted part 2 of the report of an audit as of May 31, 1922, of the books and records of the Hawkins Mortgage Company made pursuant to your authorization." To a condensed report of the audit Haight certified "that his organization has made an audit of the books and records of the Hawkins Mortgage Company of Portland, Ind., as of May 31, 1922, under the immediate direction of F. C. Willis, associate, and that the statement attached hereto is a true showing of the company's assets and liabilities as of said audit, found to exist on that date."

The government's claim respecting the $7,000,000 item is, not that the audit shows this a clear asset, without any countervailing entry, for against it as a liability appears in the opposite column of the audit, as well as in the condensation, the item, "Deferred earnings welfare securities, $6,581,346.66." The government's position is that the employment of such large figures tends of itself to magnify the importance and standing of the corporation, and to inspire public confidence, regardless of the significance of the figures. While there may be something in this, it would sadly reflect on the intelligence of those who would place reliance on the size of the figures alone, regardless of whether they indicate responsibility or irresponsibility. One of the government's experts testified that, by the placing this stock in the assets column, regardless of what in the same report was charged against it as liabilities, there was thus shown a "$9,000,-000 concern, instead of a $2,000,000 concern," as would have been the case had the

welfare stock been omitted. How absurd it is to rate a corporation at the highest figure which an audit may show, regardless of what the figure plainly means. If instead of stocks it had been real estate carried at $7,-000,000, and had appeared in the assets and against it a mortgage liability of $7,000,000, no doubt the audit figures would be entirely unobjectionable, although the items, so far as concerns actual worth or responsibility, might both have been omitted. But, according to the government's contention, it would make of the business a "$7,000,000 concern," as though that really meant anything.

In part 2 of the audit, which occupies over 60 pages of the printed record, and consists of voluminous detailed figures and many explanatory notes, is found this statement, "Liabilities—line 5—deferred earnings, $6,-581,386.60. In this account is the amount of par value of welfare securities owned by the company, for which no credit is taken on the books, and is decreased as improving conditions of the welfare societies bear to the company's financial condition to warrant an enhancement in book value. The par value of welfare stock issued to the company of $7,-223,551.60 is held at a book value of $642,-205, or slightly less than 9 cents per $1 of par value." The practice of the Hawkins Company was, when it organized a welfare society, to take 51 per cent. of its authorized capital stock and enter this upon its books as an asset of the Hawkins Company, charging against it a liability equal to the unaccrued value of the stock. Presumably in the first instance, and before any of the welfare stock was sold, this would be an amount equal to the par. It is not questioned that the company's books showed this, and to our mind the carrying of this into an audit of the books is no indication of criminality on the part of the accountants, any more than it would have such effect in case of the real estate above referred to, or in the audit of a bank whose published reports customarily indicate as its principal resource a very large amount which is represented by deposits, which might be drawn out the next moment.

It was shown in evidence that, prior to the employment of these men to make the audit, another auditor had been employed, who had refused to enter these and other items, and whose audit Hawkins rejected. Such evidence was admissible as against those with whom he had his dealings, and perhaps their associates, but it does not appear that Haight and Willis knew anything about it; but, if they did, the conclusion of criminality cannot be drawn because they

employed one method, and another auditor employed another. It would seem from the evidence that the first auditor deemed it a part of his function to go beyond the books and look into the matter of the actual value. These men contend that they had to deal only with the books and records as they found them.

It is suggested that in some instances they did enter items as the result of their own judgment, rather than what the books and records showed, notably setting up a reserve of $73,727.21 for probable loss on accounts receivable. This appears charged on the liability side in the reports, and of course was first included in the accounts and bills receivable items of the assets. The entry tends rather to exculpate than to incriminate; for it reduces the surplus by that large amount, which, had they been fraudulently bent in making the very best showing, they probably would not have done. They say good accounting required this. This is largely a matter of the judgment of the accountant, since there are no governmental rules for such accounting, as is the case with national and state banks and insurance companies.

As to the other contention, that from the books and records themselves it appeared the business of the corporation was being run at a loss, whereas the audit shows an entry of surplus and undivided profits of $442,-367.61½, Willis, who was in actual charge at Portland of the audit, testified that it was true that from the books and records it appeared that the company was losing money quite heavily and steadily, and that but for the appreciation which the books showed in the welfare stock, to the amount of over $600,000, the audit would have shown a deficit, instead of a profit and surplus. If assets came to the company from any source, to an amount larger than a deficit which would otherwise appear, the overplus beyond this deficit would represent surplus or profit, undivided so long as it remained with the company. That from time to time those in control of the company directed that there be placed to the company's credit amounts representing appreciation in the welfare stocks is unquestionably true. The books showed such, and, if there is fraud in this, it is the fraud of those who caused it to be done.

If the welfare stocks did not show appreciation, of course the entries should not have been made. But it nowhere appears that these auditors were called upon to audit the welfare societies' books. In their contempo-

raneous statement respecting one of such entries, which was made in the five-month period for which they made the statement of income and disbursements, appears the following: "Income, line 17, amount shown of $197,325, is the accrued portion of the enhanced value of welfare stock owned entered on the company's deferred earnings account June 30, 1922, and the total value taken credit for on the company's books for Iowa welfare securities of $7,000. The amounts entered were not segregated to the various welfare societies whose stock was included in the appreciation of value. It is recommended that such segregation be made and entered on the deferred earnings account. Your auditor has' made no attempt to ascertain the correctness of the values placed on the accounts for appreciation of welfare securities, deeming that a matter proper to be decided by the officers and directors from information regarding the status of the welfare societies not available to your auditor, except as a result of investigation of the books and records of the welfare societies whose stock is affected by the entries." It was testified, without contradiction, that they did not have access to and did not examine welfare societies' books and records. The report as a whole sharply criticizes in numerous respects the company's keeping of its books and records, and practically sets up a new system therefor, which these defendants say they were employed mainly to do.

It is contended that criminality is to be gathered from the fact that the explanations and criticisms in part 2 above referred to are not carried into the condensed statement of the audit, which was made for publication. The notes and explanation of part 2 are very voluminous, and it is hardly to be expected they would be carried into the condensed statement or balance sheet, which is customarily a résumé of detailed figures. However, the opposite figure respecting the welfare stock fully appears there, and the certificate indicates that the audit was made from nothing but the books and records of the company. It does not appear that Willis and Haight had any prior contact or dealings with Hawkins, or any interest in him or his companies, and for anything that was shown to the contrary, they, residing in Indianapolis, were employed in the regular way to do this work, and it does not appear that they were to receive or did receive for their work anything beyond the usual and ordinary compensation for such service. While a report so predicated, unaccompanied by an appraisal, can give little assurance to the public as to the true condition of the concern itself, apart from that of its books and records, nevertheless, so far as regards the items here particularly relied on to indicate criminality, the evidence shows they were taken from the books and records of the company, just as they purport to be, and we are unable to perceive in the transcript any evidence of criminal conduct of these two.

Our conclusion is, and it is so ordered, that the judgments against Sacks, Willis and Haight be reversed, and the cause remanded for retrial as to them, and that the judgments against the other nine defendants are, and each of them is, affirmed.