# IN THE MATTER OF THE APPOINTMENT OF THE TUBA CITY

## DISTRICT PROSECUTOR

Decided on July 27, 1977

David P. Schneider, Window Rock, Arizona, for Plaintiff-Appellee

Lawrence A. Ruzow, Vlassis, Ruzow & Crowder, Phoenix, Arizona, for Defendant-Appellant

Before KIRK, Chief Justice, BECENTI and YELLOWHAIR (Retired) Associate Justices

KIRK, Chief Justice

This matter comes on appeal from an order entered June 17, 1977, by Robert Walters, Tuba City District Judge, commanding Raymond Tso, Acting Chief Prosecutor, to assume the duties of the Tuba City District Prosecutor for thirty days for the purpose of orienting and training the newly appointed prosecutor for that district, Mr. Joe Ray, Jr.

This order was in fact the second order entered in that case. The first order, issued May 9, 1977, held Tso in contempt of court for failing to appoint a district prosecutor for over six months.

This order had also been the subject of an appeal, which was dismissed as moot in view of the District Judge's decision of June 17 vacating that order at a hearing held pursuant to Rule 5(d) of the

Rules of Appellate Procedure.

Upon vacating that order, the order presently appealed from was entered, pursuant to Judge Walters' interpretation of Title 7, Section 306 of the Navajo Tribal Code.

That section reads, in part as follows:

> The judge may appoint a member of the Tribe as prosecutor. 7 N.T.C. § 306.

There is no legislative record of any discussion of this part of the Code.

The order required Tso to be in Tuba City, Arizona, five days a week from 8:00 A.M. to 5:00 P.M., from June 20, 1977 to July 20, 1977, for the purposes of training Mr. Joe Ray, Jr., and of assisting him in the actual prosecution of cases.

Apparently, negotiations were held in the judge's chambers concerning the nature of this order. Lawrence Ruzow, counsel for the Acting Chief Prosecutor, and Tso himself evidently did not anticipate a new order being entered on June 17th.

The situation was evidently exacerbated by Tso's having spent two weeks avoiding a bench warrant commanding his arrest for failure to comply with the first order. The bench warrant was withdrawn at the June 17th hearing.

When the second order was entered and the motion for reconsideration denied, the decision was immediately appealed and a stay of execution requested on June 21, 1977.

The stay was denied on the grounds that there was no injury to appellant in complying with the order pending appeal.

Meanwhile, appellant here had filed suit in the federal District Court for the District of Arizona, naming Robert Walters as defendant and raising substantially the same issues as are raised by this appeal.

This obvious attempt to intimidate the Navajo Courts was an example of the irresponsibility of counsel for the appellant. A further example was provided in the oral argument when Ruzow argued that the judge's order was the result of manipulations by certain Judicial staff.

The real issues in this case can be summarized as follows:

1.  Does the order of June 17, 1977, constitute "peonage" as that term is used at 18 U.S.C. § 1581?

2.  Does the order of June 17, 1977, constitute "involuntary servitude" as that term is used in the Thirteen Amendment to the U.S. Constitution and at 18 U.S.C. § 1584?

3.  Did any extra-judicial statements made by Judge Walters about this case constitute a deprivation of the due process guaranteed by 25 U.S.C. § 1302(8) and the Navajo Bill of Rights, 1 N.T.C. § 8?

4.  Was the order of June 17, 1977, properly grounded in 7 N.T.C. § 306?

5.  Was the order of June 17, 1977, actually one in the nature of mandamus and, if so, is the writ of mandamus barred to Navajo District Courts by Rule 16 of the

-170-

Rules of the Court of Appeals?

The first issue can be disposed of summarily.  Counsel for appellant admitted at the hearing that the "peonage" argument was an ignorant one.  "Peonage" refers to imprisonment for debt or forced labor in repayment of debt.  Pierce v. United States, 14 F.2d 84 (5th Cir., 1944).  The facts here clearly exclude this claim.  The argument having been raised at all illustrates the dangers of preparing briefs based on headnote research rather than on reading the cases.

The second argument is almost equally silly.  "Involuntary servitude" has never been held by any court we know of to include a court order requiring an irresponsible public official to do his duty.  In fact, cases have held the various forms of apparent involuntary servitude are not such within the meaning of the Thirteenth Amendment to the United States Constitution.

For example, State v. Rush, 46 N.J. 399, 217 A.2d 441 (1966), holds that assignment of counsel without compensation to represent indigent defendants does not constitute involuntary servitude or peonage.

Delorme v. International Bartenders' Union, 18 Wash.2d 444, 139 P.2d 619 (1943), stands for the proposition that a court may require a person subject to its jurisdiction to perform his duty [as the court sees it] without violating the Thirteenth Amendment.

The Selective Service Act has been held not be "involuntary servitude" prohibited by the Thirteenth Amendment. Selective Draft Law Cases, 245 U.S. 366 (1918).

Of course, there have been numerous cases alleging that various civil rights acts impose involuntary servitude on those seeking to discriminate. This form of "servitude" has not been held unconstitutional. Neither has the servitude imposed by "back-to-work" court orders in labor-relations cases been held to violate the Constitutional prohibition.

It is, therefore, clear that compulsory public service even uncompensated does not violate the Thirteen Amendment. In this case, the public service required of Tso was that for which he was already being paid, if one assumes that a duty of any supervisor is to train his subordinates to propely carry out the jobs for which he has hired them. We do not feel this to be an unwarranted assumption. Whether the training was carried out in Window Rock or Tuba City does not seem to be the controlling factor, so long as the choice is reasonably related to the underlying purpose.

We simply can not understand the argument that "involuntary servitude" exists in spite of the public purpose served, in spite of the relationship of the required service to the appellant's established duties (examined in the light of common sense), and in spite of the fact that appellant was compensated both for his services and for his expenses during the limited life of this order.

-172-

The third issue presents a case of over-reaching argument. No one would argue that statements in the nature of those referred to in Berger v. United States, 255 U.S. 22 (1921) are prejudicial and that the hearing of a case by a judge making comments on it such as those constitutes a violation of due process.

However, the only comments by Judge Walters established by the appellant were to the effect that Judge did not believe Tso's "witchcraft" claims and that the Judge thought it was wrong for Tso to avoid the bench warrant.

While we do not approve of judge's commenting publicly on a case before him or any other judge, we cannot agree that statements such as the above give rise to a violation of either 25 U.S.C. § 1302(8) or 1 N.T.C. § 8.

The fourth question - whether the order was proper under 7 N.T.C. § 306 - also raises the issue of whether the court's order is a "violation of fundamental principles of administrative law" [Appellant's Brief, page 9].

Appellant's counsel presented to this Court a long list of his client's duties, as set forth in 2 N.T.C. § 983 alleging that the District Court's order made performing these duties impossible.

There is no conflict between 2 N.T.C. § 983 and the power of the court as expressed in the order of June 17th.

Paragraph (2) of 2 N.T.C. § 983 requires the Chief
Prosecutor to:

> "investigate, prosecute and dispose of all cases
> within his jurisdiction, acting independently and
> upon his own authority within the guidance of
> law and professional ethics in the performance
> of his duties."

Paragraph (4) says that he must "exercise supervisory control and direction..."

Paragraph (9) requires him to delegate authority to members of his staff [presumably including district prosecutors].

In the light of these provisions, can it be seriously argued that an order requiring Tso to train an inexperienced, newly-appointed district prosecutor is an improper interference with Tso's administrative responsibilities?

The argument that the order "represents a court telling an administrative body how to do its job" [Appellant's Brief, page 11] begs that issue. Courts do this all the time because administrative agencies are bound by the law just like everyone else.

If the statement means to say that the order constituted an unwarranted intrusion into a legitimate administrative function, then the argument is false because the order does not describe in detail how the Acting Chief Prosecutor is to carry out the training function mandated to him.

Since Judge Walters cited 7 N.T.C. § 306 as the basis of his order, we must examine whether that part of the Code was properly invoked by the court as the authority for its action.

Title 7, Section 306 reads as follows:

> Professional attorneys shall not appear in any proceedings before the Court of the Navajo Tribe unless rules of court have been adopted as set forth in section 301 of this title prescribing conditions governing their admission and practice before the court. Every defendant shall have the right to have some member of the Tribe represent him and in the event he has no such representation, a representative may be appointed by the judge. The judge may appoint a member of the Tribe as prosecutor.

Read in this context, the sentence concerning the appointment of a prosecutor does not, it seems to us, cover situations such as this case presents.

Raymond Tso was not really "appointed" as prosecutor but rather the order was written that way as a vehicle for requiring him to train his own inexperienced appointee for the Tuba City district.

What the Judge was attempting was an action in the nature of mandamus, requiring an already appointed prosecutor to properly carry out his duties.

Therefore, the remaining question is whether Rule 16 of the Rules of the Court of Appeals was intended to restrict the writ of mandamus to the jurisdiction of the Court of Appeals.

Rule 16 must read in the light of 7 N.T.C. § 173, which reads:

> The Court of Appeals shall have jurisdiction to hear appeals from final judgments and other final orders of the Trial Court of the Navajo Tribe except in criminal cases where the defendant is sentenced to less than $26.00. In such cases there shall be no right of appeal.

7 N.T.C. § 172 specifically limits the jurisdiction of the Court of Appeals to "appeals from final judgments and other final orders" of the trial courts.

7 N.T.C. § 173, therefore, was intended only to provide the remedy of mandamus as to trial courts themselves. It does not confer original jurisdiction on the Court of Appeals for mandamus proceedings involving Executive Branch officials.

Rule 16 was intended only as clarification of 7 N.T.C. § 173. Obviously, no court rule could alter the substance of the Navajo Tribal Code, which grants jurisdiction to the trial courts in comprehensive language and includes an "all-writs" Section. 7 N.T.C. 133 and 134.

In view of our reading of these four statutory provisions, we conclude that the District Courts, and only District Courts, have original jurisdiction to grant writs of mandamus in cases such as these.

Therefore, we hold that Judge Walter's order of June 17th was not correctly grounded in 7 N.T.C. § 306 but was, rather, really a

writ of mandamus improperly handled.

On this basis, we reverse the decision of the Tuba City
District Court.

BECENTI, Associate Justice (ret.) and YELLOWHAIR, Associate
Justice (ret.) concur.