**GREENBAUM et al. v. UNITED STATES.**

**No. 7695.**

Circuit Court of Appeals, Ninth Circuit.

Oct. 28, 1935.

Rehearing Denied Dec. 19, 1935.

114

Alexander B. Baker, Louis B. Whitney, and Lawrence L. Howe, all of Phœnix, Ariz., and Theodore E. Rein, of Chicago, Ill., for appellants.

Clifton Mathews, U. S. Atty., and F. E. Flynn, Asst. U. S. Atty., both of Phœnix, Ariz.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

It is apparent from the argument here that certain evidence, which we find required to support conviction, may not have been produced by the appellee, because it may not have seemed necessary in view of an erroneous assumption of the lower court regarding the admissibility of certain books of account. The facts are involved and cover transactions and accounting in the establishing and development of a large and widely spread business organization, during twenty months of its existence. We, therefore, have undertaken the labor of an extended consideration of the evidence and law for guidance in the new trial, which, from the record here, it appears that justice requires.

Appellants were indicted under section 215 of the United States Criminal Code (18 USCA § 338) for having devised a scheme to defraud sundry persons and, for the purpose of executing the scheme, causing to be placed a letter in the United States Post Office in Phœnix, Ariz. The letter, mailed April 9, 1930, and claimed as an incident to the scheme, was innocuous in itself. The plan charged was an elaborate one involving a number of persons other than the appellants and included the organization of and the sale of shares of stock of an Arizona corporation, "The Clarence Saunders Stores, Inc.," formed to establish a chain store grocery business in Arizona, under a peculiar system licensed by Clarence Saunders, which stock was falsely represented to be of greater value than the financial position of the corporation warranted. It was further charged that the appellants, in furtherance of the sale of the stock, fraudulently intended falsely to represent and did represent that the business of the corporation was being conducted under the guiding hand of Clarence Saunders,

whereas the appellants knew that Saunders had no guiding hand in the· management or supervision of the business.

The corporation several times changed its name and is hereinafter called the Stores Company. There was a demurrer to the indictment on the ground that in describing such an artifice to defraud there had been in reality two offenses alleged, one consisting of the sale of the stock by misrepresentation of its value, and the other the fraudulent conversion of the assets after the stock was sold. The demurrer also claimed vagueness, indefiniteness, and uncertainty in the charges. However, the indictment describes the scheme as a single one for the defrauding of the prospective stockholders, and the fact that it states one or more incidents of the scheme which might constitute separate crimes in themselves, apart from the use of the mails to promote the scheme, does not convert it into two separate offenses under section 215 of the United States Criminal Code. McLendon v. United States (C.·C. A.) 14 F. (2d) 12, 13; Sunderland v. United States (C. C. A.) 19 F.(2d) 202, 205, 207; Worthington v. United States (C. C. A.) 64 F. (2d) 936, 938; Scheib v. United States (C. C. A.) 14 F.(2d) 75, 77.

The scheme was charged with ample particularity to apprise defendants of what they would have to meet on the trial. This is sufficient. Hagner v. United States, 285 U. S. 427, 431, 52 S. Ct. 417, 76 L. Ed. 861; Wheeler v. United States (C. C. A. 9th) 77 F.(2d) 216, 218. The assignments of error in the overruling of the demurrers are not well taken.

The proof that appellants mailed the indictment letter of April 9, 1930, in furtherance of a scheme to defraud the purchasers of the stock was entirely circumstantial; that is to say, such a scheme would have to be inferred beyond a reasonable doubt from acts circumstantial in nature occurring long after the incorporation of the Stores Company in October, 1928. There was no evidence, either in writing or in oral statements of appellants, of an express intent to defraud. The prosecution's evidence in this regard could be divided into two classifications: First, proof offered to show a scheme to defraud by representing to prospective purchasers of stock that Clarence Saunders would and did have a guiding hand in connection with the business, whereas it was asserted that Saunders gave and would give no such guidance. Second, proof offered of representation to such purchasers of the profitable conduct of the grocery· business, whereas it was conducted at a loss known to appellants.

First. The prosecution claims that the appellants represented such guidance by Clarence Saunders in a letter to a prospective purchaser from the Bond & Mortgage Corporation, a corporation they controlled. The language of the indictment concerning such guidance is: "That the business of said Clarence Saunders Stores, Inc., was being conducted under the 'Guiding hand' of Clarence Saunders; when in truth and in fact, as the defendants then and there well knew, Clarence Saunders had no hand in the management or supervision of the business of said corporation." The guidance portion of the letter is as follows: "With Clarence Saunders' guiding hands over the different stores to be established under his name, we can only say one thing and that is, within a few years you will find Clarence Saunders Stores the outstanding food distribution stores in the world."

This letter with its statement of the guiding hand over the stores "to be" established was dated August 12, 1930, four months after the crime was alleged to be committed by the mailing of the indictment letter on April 9, 1930. At most it is a representation not that Clarence Saunders had been guiding, but that he would guide, future established stores.

To support the verdict as far as it rests on this alleged fraud, we would be required to find a rational inference warranting the jury in believing beyond a reasonable doubt (a) that appellants' letter contained a deceitful assertion of Clarence Saunders' guidance; (b) that appellants knew its falsity; and (c) that, if false, the statement made four months after the alleged commission of the crime evidenced a scheme to defraud at the time the indictment letter was mailed.

(a) Concerning the absence of Clarence Saunders' guiding hand in the business of selling the groceries, the testimony offered by the prosecution to maintain its burden of proof is as follows: The Stores Company, in a manner hereafter described, obtained a license or concession from Clarence Saunders which provided for the establishment in Arizona and New Mexico of not less than twenty-five stores prior to Janu-

ary 1, 1931, of which license the following are pertinent portions:

"To install such standard store equipment in detail in each store to be operated under this agreement as may be required by licensor the same to be purchased from Licensor at standard prices which shall be in effect at the time of shipment, except those items which the Licensor shall instruct to be purchased elsewhere by the Licensee.

"To have placed in each store in the particular way and position as shall be directed by the Licensor, a large sign of the dimensions as shall be designated by the Licensor, on which shall appear the trade-name 'Clarence Saunders, Sole Owner of My Name,' as prescribed by the Licensor. * * *

"The Licensor shall have authority through any of its representatives at any time to inspect any store operated hereunder, including its merchandise, and shall have the further authority to inspect and audit the records of the Licensee and obtain therefrom such information and reports as may seem desirable to the Licensor.

"To pay the Licensor promptly, according to its terms of sale, for all merchandise and/or store equipment sold by it to the Licensee from time to time. * * *

"Plans and specifications for each store building; instructions as to all changes and the remodeling that shall be required in each instance; design for the color scheme to be put on each store front; design for the trade-name that shall be inscribed on show windows and on the walls of the building; a detailed list with a standard description of all fixtures that shall be required for each store, and a price of each item at which the Licensor will sell it to Licensee; a floor plan showing the position of, and instructions for the installation of each store fixture; arrangement plan for the display of all merchandise; standard advertising copy that shall be used for the opening announcement of the first store that shall be established; advertising copy and instructions as to its use in the operation of the stores; a list describing the merchandise assortment that shall be handled by each department of a store; information as a guide for the purchasing of merchandise, how to assemble and distribute; instructions as to the means and methods that shall be used in accounting, and for keeping all necessary records in merchandising and store operation; instructions as to the standard rules and regulations that shall govern in the establishment, maintenance and operation of the stores, and instructions as to all other standard rules and regulations which are contemplated by this agreement."

Here we have a peculiarly licensed set of fixtures used in retailing groceries and instructions as to the detail of the merchandising. It is obvious that the compliance by the Stores Company with the instructions of the above concession or license would warrant the statement that it was conducted under the guiding hand of Clarence Saunders. To support its burden of proof that there was no such guidance, the prosecution offered no evidence to show that the business was not substantially conducted in the manner required by the instructions of the license. It is testified that Clarence Saunders did not personally inspect the stores, but it would still be his guidance through the store fixtures and in following the instructions. A. E. Sanders, under indictment with the appellants, turned state's evidence, and testified that instructions referred to in the license were received by him, and that some were carried out and others not. As to those that were not carried out, the prosecution offered no testimony as to their character or as to whether the failure to carry them out amounted to a substantial failure to conduct the business in accordance with the requirements of the instruction. In a criminal case of this character, the burden of proof required to send men to prison cannot be sustained on a mere guess by the jury as to whether the instructions not followed were in matters of sufficient importance to make the admitted following of the remaining instructions not a conduct of the business under the guidance of Clarence Saunders.

(b) Absence of proof of appellants' knowledge that the guiding terms of the license had not been followed by the Stores Company. Assume, however, that the instructions were not followed and that the business was, in effect, entirely free from Clarence Saunders' guidance. The fair and exhaustive summary of the facts in appellants' brief claims that there is no evidence in the record that the appellants had any information charging them with the knowledge that such guidance was not followed in the administration of the grocery busi-

ness. This statement is not challenged in the limited summary in the prosecution's brief of its evidence of the voluminous and intricate facts upon which it sought to show the fraudulent scheme. On the contrary, the government's witness Brandt, during most of the period in question the accountant for the Stores Company, testified that the Greenbaums had nothing to do with the management of the business of that concern. Appellants' statement of the formation of the company and the conduct of the grocery business, contained in the following summary, is unchallenged in the prosecution's brief here, and is supported by the record. These facts are relevant here to show that, while appellants are not proved to have had actual knowledge of the extent of Saunders' guidance, the prosecution also has failed to maintain its burden by showing any such participancy in the management of the grocery business as would constructively charge them with such knowledge.

The appellants and A. E. Sanders, for twenty years in the grocery business, and then president of the Piggly Wiggly Southwestern chain grocery stores in Arizona, discussed in September, 1928, a project to establish a grocery chain in that state under a system of merchandising devised by Clarence Saunders. Appellants were to be the brokers for an issue of stock to investors in the company. Saunders had a very wide and favorable reputation for his establishment of chain grocery systems. A. E. Sanders, on September 28, 1928, obtained from Clarence Saunders a license or concession to operate a chain of not less than twenty-five stores in Arizona and New Mexico. It is a fair inference from the proofs of the prosecution that one of the appellants was present when the license was procured from Saunders, and that appellants as prospective brokers knew the provisions of the license under which the grocery business was to be conducted.

■ In the fall of 1928, there was great apparent, if superficial, prosperity, and we take judicial notice of the fact that at that time, a year before the business collapse, many prominent business authorities and learned economists believed the extraordinary prosperous condition to be permanently established. So far as concerns A. E. Sanders, with his twenty years' experience, opening a new chain at this time, or as concerns appellants becoming his bro-

kers, there is no attempt by the prosecution to maintain a burden of proof that it was in any way in violation of business ethics or contrary to any provisions of the Arizona law. There is nothing on which to base an inference that the project was ab initio a stock selling cheat. Over twenty stores were in fact established, and there is no reason to doubt the testimony of A. E. Sanders, the prosecution's witness, that "I was sold a thousand per cent on the Clarence Saunders Stores. I thought the business was going to be successful, and as far as I knew the Greenbaums thought so."

The consideration to Clarence Saunders for the concession was the payment of one-half of 1 per cent. of the gross sales of the chain and $2,000 in cash. No proof was offered and it is not contended that the consideration was excessive. A. E. Sanders had an option on several "Cash-Way" grocery stores in Tucson, Ariz. On October 18, 1928, he formed an Arizona corporation called the Clarence Saunders Stores, Inc., the Stores Company of this opinion. His company then applied to the Corporation Commissioner of Arizona for the permit necessary to sell its stock; 151,000 no par common shares to A. E. Sanders for transfer to it of the concession and the option, 1,500 preferred capital stock, with 8 per cent. cumulative dividends, at $100 per share, and 50,000 shares of no par common at $1 per share. The Corporation Commissioner granted the permit.

The prosecution offered no evidence to show that the permit was improperly procured. It made no attempt to show the value of the concession in the boom days of 1928. Testimony offered of its value in September, 1930, two years after its acquisition and a year after the depression had begun, is not relevant to a determination of its worth when acquired. Of course, its value cannot be determined by the agreed consideration to Clarence Saunders, consisting largely of the one-half of 1 per cent. for the gross sales; a then indeterminable quantity. Nor is there any evidence adduced of what would be a fair price for the option on the Cash-Way stores. We are therefore compelled to assume the validity of the permit from the state authority controlling stock sales and that the 151,000 no par common shares subsequently issued to A. E. Sanders were his property to deal with as he chose. In the absence of any evidence of improprie-

ty, the fact that he gave some of it to appellants as a premium or retainer for their services as brokers cannot be criticised.

The indictment does not charge that the election of A. E. Sanders to the presidency of the Stores Company was purposed to deceive any one into believing he was Clarence Saunders. Nor was there any proof that any one was so deceived. It is not the case of taking an unknown person of a name identical with one possessed by a widely and favorably known business man and using it to deceive investors or buyers. When appellants and A. E. Sanders in 1928 discussed the formers' procuring the finances for a new grocery chain, the latter's twenty years' experience in that very trade was not shown not to have had a separate asset value to the proposed enterprise. Success in such a competitive business as the retail grocery trade is largely dependent on management, and A. E. Sanders' experience had included services in another Clarence Saunders chain. He was peculiarly fitted to follow the guidance of Clarence Saunders' instructions. With the burden of proof of fraud on the prosecution, the failure to show that any one was in fact deceived by a confusion of Clarence Saunders with A. E. Sanders is significant. Letters signed by the latter speak of the former in the third person, thus disclaiming any identity and negativing any scheme to use his name to defraud.

The appellants became the sales agents of the stock for the Stores Company, at first selling as Greenbaum Bros., and later through the Bond & Mortgage Corporation, an Arizona corporation formed by them. None of the letters sent out by them in the company's name purports to assert or admit appellants' managerial capacity over the grocery business.

The government's witnesses testified that appellants had an office separate from the Stores Company in a different building; kept separate books of account of their stock transactions; that none of them was a member of the board of directors of the Stores Company; that the company was controlled by its own board and A. E. Sanders; that the Stores Company's grocery business was not in any way managed by the Greenbaums, nor did they have any direction or control over the company's books of account, nor connection with the entries in such books and records. There was no evidence to show that the brokerage contract for services to be compensated by the commissions allowed by the Arizona law was not made and performed at arm's length from the Stores Company.

In the face of this evidence there is nothing to warrant the inference that the appellants were converted from employed brokers to managers of the company, constructively or otherwise charged with knowledge of the extent to which Clarence Saunders' guidance through his instructions was or was not followed. The prosecution has not sustained its burden of proof that appellants had reason to believe that Clarence Saunders had no guiding hand in the business, even if it had been sustained as to the absence of such guidance.

(c) What we have said about the prosecution's failure to sustain its burden as to the falsity of the claim of Saunders' guidance and as to any knowledge of the appellants concerning any failure of the company to follow it makes it unnecessary to consider whether the letter of August 12, 1930, referring to stores "to be" established, is evidence of the scheme by appellants, charged in the indictment, to defraud purchasers by falsely claiming such guidance, which scheme existed four months earlier when the crime was alleged to be consummated.

Second. The prosecution having failed to sustain its burden on the charge of false representations concerning Clarence Saunders' guidance of the enterprise, the question remains, Was it supported by proof of the charges of a scheme by appellants falsely to represent the profitable and prosperous condition of the business?

The evidence offered on this charge was the letters representing as follows:

"You will find that your investment in Clarence Saunders Stores will be one of the most profitable ever made."

"Through your preferred stock you are receiving 8 percent a year on your investment from the proceeds of the stores and warehouses." "I believe that your common stock will eventually surprise you by the large annual income per share you will receive from it over a long period of years."

"Your stores in Arizona are doing an enormous business. Do not gamble away your interest in them."

"The volume of business at present has been very satisfactory, and we expect that

this year will run into several millions of dollars."

"Our volume of business is beyond any figure that we had anticipated, with each month showing a substantial increase. You, no doubt, are aware that Clarence Saunders Stores in Arizona are home owned, home operated, and operated by Arizona capital."

"Our common stock is now being sold at $7.50 per share, this raise being justified by the very satisfactory condition of the company, which has really exceeded our expectations."

There is evidence sufficient to attribute to appellants responsibility for these representations.

So far as the representations assert that the business was enormous, was in a prosperous condition, an advisable investment, would have a great future, etc., it is apparent that they might all be true in rapidly establishing twenty-five new stores and building up trade for them, even if in this developing period the aggregate business of all the stores showed a loss. It is common business experience that a new retail merchandising business or any business relying on many customers may be run at a loss while the business is being satisfactorily established. The prosecution did not attempt to sustain a burden of proof that such statements as outlined in the beginning of this paragraph, disconnected from any claim of an operating profit, were false or fraudulent.

The prosecution on this issue relied solely on the representations that the aggregate business of the many stores already was earning such profits, and that dividends had been properly earned and paid therefrom. It offered the expert testimony of accountant Null and certain of the Stores Company's books of account. Null's opinion clearly supports the prosecution's contention that the combined business of all the grocery stores was conducted at an operating loss at the time appellants advised prospective purchasers it produced a profit.

■ Concerning the admissibility of Null's testimony, based on the several books of account rendered available for his cross-examination, it is to be noted that it is not the claim of the prosecution that the books were kept pursuant to an agreement or scheme of the appellants to have them falsely show a profit. On the contrary, the prosecution claimed at all times that the books of account underlying Null's testimony were truly kept and in fact truly showed a loss, appearing both from the books of original entry, certain of which were not produced, and in the summaries in the ledger in evidence. The books, therefore, were not offered or admissible as evidencing in themselves a fraud or a fraudulent scheme.

Undoubtedly the mere summaries of the books showing a loss would be admissible in evidence were it shown either (a) that the appellants had participated in their keeping, or (b) that the appellants' position changed from brokers employed by the Stores Company to principals for whom the corporation was agent in keeping the accounts of its grocery business.

Concerning any contention that the appellants were at any time converted from employed brokers, engaged in selling stock, to dominant or participating managers of the grocery business itself, we have already pointed out the testimony of the prosecution's witness to the contrary. Its witness Brandt testified affirmatively that appellants not only had nothing to do with the keeping of the books of the Stores Company, but also that they had nothing to do with the management of its grocery business. What has been shown in this regard under the first classification of the proof applies as well here.

We are therefore required to determine the admissibility of the expert testimony, showing a loss in operations, with reference to its competency as evidence against strangers to the grocery business whose transactions the books reflect.

In this connection it is of paramount importance to note that this is not a case where a single or few transactions are to be explored in but a part of the company's records. Since the summaries of the ledger are not chargable as admissions of the appellants because of the failure to prove any relationship of agency for them of the corporation, all the books of the Company showing the transactions arising in the many stores must be examined to prove the ultimate fact of loss in their aggregate business.

■ It has now long been established in our law that a man may be found guilty and imprisoned by proof of such false representations, based upon expert accountants' opinion testimony concerning the corporate

records of the business in question, which records must be available, but may never be introduced in evidence against him. The intricacies and vast extent of many corporate enterprises, reflected in detailed and extensive accounting, embodied sometimes in scores of books, and involving often hundreds of thousands of items, lend themselves to the concealment of fraud in statements by those who with criminal intent seek to procure new investors in corporate shares. From the necessities of trials of such causes, the primary reliance of the prosecutor is on his expert witness. Without him, juries of laymen are unable to follow through the mass of detail of widely extended business transactions and would be obliged, on their oath, to acquit in nearly all cases where profit or loss as shown by the company's records is the ultimate fact in determining guilt.

On the other hand, such intricacy and extent of detailed figures, massed in evidence against an accused man, place him in a perilous position. Experts differ on theories of accounting; they are not unknown to assume the functions of advocacy instead of detached analysis or statement; nor are they always free from error and mistake of fact and figuring as well as in theory. This implies no reflection on the expert in this case, but the human factor in experts' testimony requires that they shall not be permitted to bring into the case statements of their conclusions as to books not available for the purpose of cross-examining the experts as to such conclusions. Courts generally, and this court in particular, have been careful to lay down the protective requirements necessary to minimize the risk to the accused arising from such opinions of experts. In an opinion of Judge Rudkin, the court has stated the rule to be, where books of account are offered as evidence against one not a party chargeable with an interest in their keeping, that: "In order to lay the foundation for the admission of such evidence it must be shown that * * * the entries [in the books] were either original entries or the first permanent entries of the transactions,". Osborne v. United States (C. C. A.) 17 F.(2d) 246, 248, certiorari denied 274 U. S. 751, 47 S. Ct. 765, 71 L. Ed. 1332.

Mr. Null's conclusion that the Stores Company had operated at a loss in this period was based on his examination of all of the records kept at the main office of the company, and its warehouses from which its merchandise was delivered to the various stores scattered over Arizona, and at the stores themselves through which the company carried on its retail sales. The appellants objected to this testimony of the conclusions of the expert on the ground that only a part, if any, of the books of original or first permanent entry, upon which his conclusions were based, were offered in evidence or brought into the courtroom or placed by the prosecution within reach of appellants for Null's cross-examination.

In the absence of proved agency of the corporation for the appellants, it follows, from the rule recognized by this court in the Osborne Case, that before appellants can be convicted on a charge involving fraudulent misrepresentations, attempted to be established by expert opinion or conclusions based on books of account, to whose keeping they had no relation, one or another of the books produced in evidence or made available to the accused must be shown to contain the items of original or first permanent entry, which, when summarized, prove the misrepresentation.

The only books produced by the prosecution to support Expert Null's summary showing the loss for the period ending December 31, 1929, are: (1) The book of record of cash and disbursements; (2) two books of cash receipt records; (3) the journal; and (4) the general ledger. The record is bare of any testimony that all the pertinent items of original entry or first permanent entry were contained in these books offered in evidence. In ordinary business bookkeeping the ledger and journal are mere summaries of other permanent records; the cash and disbursement books and cash receipt books may or may not record the original or first permanent entries, where, as here, the sales were made in some twenty separate stores. The likelihood is that the first permanent entries would be made at each store carrying on its own individual business. Daily reports of sales were made from each store to the central office, but whether these reports were copies from first permanent entries at the stores does not appear. The contrary is suggested by the testimony. One of the prosecution's witnesses testified that: "There are other books that are not here, such as the accounts receivable and the accounts payable, and the detail

record of the operation of the various stores, and things like that. I would call the operation of the Stores operating accounts, used as detail information and then at the end of the periods transferred to the general books, which are here."

The testimony shows that the invoice registry containing entries preceding journalization and necessary in determining the inventory factor in the general summary was not produced or offered. The record of the inventories was not produced or offered, although the items of merchandise purchased in the expert's summary amounted to $1,103,646.32 and the item of inventory on December 31, 1929, to $250,726.77.

So obvious was the absence of these original or first permanent entry items that the prosecution's attorney, Mr. Dougherty, finally admitted that the only books produced were a mere "summary of the original entry books." The colloquy in which this admission is made by the prosecution is as follows:

Expert Null stated, concerning the absence of these records and books: "It is because of my previous acquaintance with the other books and records which are not here that I am able to prepare this tendered statement." Mr. Dougherty, for the prosecution, asked that the answer be stricken because the question had already been answered.

"Mr. Dougherty: He said that this profit and loss was compiled from those books on the table and these books on the table he has testified is a summary of his examination of all the books.

"The Court: You don't mean that?

"Mr. Dougherty: These books are a summary, your Honor, of the original entry books." Tr. 370.

The court allowed the answer to stand.

None of the exceptions to the rule we have stated was proved in this case. There is no evidence of the loss of books. On the contrary, Expert Null, at a very recent date, had used the absent books of original or first permanent entry as a basis, in part, of his summary of the alleged loss. There was no offer to produce the missing books, and appellants were not shown ever to have had them in their possession.

The trial court evidently regarded the books, although summaries, as sufficient evidence to prove the claimed loss. The appealing defendants, when the opinion of the expert that there had been a loss was introduced, asked for sufficient time to make an examination of the records of the five books. Since the items of merchandise handled amounted to upwards of $1,000,000, with $250,000 stock on hand, the cash and disbursement and cash receipt records alone might require many days of expert examination. But twenty-four hours were allowed, although the expert testified he could not certify to the correctness of his opinion without weeks of study. Quite likely the time allowed by the court was ample, if all that was needed was to examine the summaries contained or to be derived from the books, admitted by the government to be summaries in themselves, to prepare for cross-examination of the expert. However, as we have indicated, men cannot be convicted of a federal offense, requiring the proof of a fraudulent misrepresentation of a profit when there was a loss, on a mere expert opinion based on summaries of the business, in whose management they did not participate and where the keepers of the books were not agents of the accused.

We therefore hold that the objection to the admission of the evidence of Expert Null regarding the loss for the period ending December 31, 1929, should have been sustained, and that the failure to do so constituted reversible error. Much of what has been said applies to Null's opinion of loss shown in subsequent accounting periods, concerning which there is exception and assignment of error, but the above sufficiently advises the parties on a new trial.

There was other evidence tending to show that there had been a loss and that the appellants had knowledge of it, given by the witness Brandt. Brandt had been chief accountant and comptroller of the company and supervised the books during the latter portion of the year 1929. He testified that, prior to the payment of the dividend declared at the end of this period, he had advised one of the appellants that there had been an operating loss during that period, and that at most there had been a capital surplus. He claimed that he delivered the balance sheet for the period ending December 31, 1929, to one of the appellants, a copy of which was admitted in evidence, and is as follows:

**"United Clarence Saunders Stores, Inc.**

Arizona—New Mexico

**"Financial Statement**

**"December 31, 1929**

**LIABILITIES**

| ASSETS | | | | LIABILITIES | | |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | **Current Liabilities** | | |
| Cash | $ 51,326.72 | | | Accounts Payable | $ 62,906.22 | |
| Accounts Receivable | 70,974.05 | | | Trade Acceptances | 4,885.83 | |
| Inventories (at cost) | 251,400.93 | | | Accrued Payroll | 2,904.95 | |
| | | | | Accrued Expenses (Current) | 46,761.28 | |
| Total Current Assets | $373,701.70 | $ 373,701.70 | | | | |
| Investments & Securities | | 113,100.01 | | Total Current Liabilities | $117,458.33 | $ 117,458.33 |
| | | | | **Fixed Liabilites** | | |
| **Fixed Property Investments** | | | | Purchase contracts payable | $ 9,182.38 | $ 9,182.38 |
| Fixtures and Equipment | $147,743.79 | | | **Reserves** | | 746.27 |
| Automobiles & Equipment | 8,939.98 | | | **Net Worth** | | |
| | 156,683.77 | | | Capital Stock: | | |
| 20% Less; Reserve for Depreciation | 31,336.75 | | | Issued & Outstanding | | |
| | 125,347.02 | 125,347.02 | | Preferred, 8% Cumulative | $462,000.00 | |
| | | | | Common, No Par Value, 216,587 Shares | 10.00 | |
| **Deferred Charges:** | | | | Total Outstanding | 462,010.00 | |
| Unexpired Insurance | $ 2,042.06 | | | | | |
| Prepaid Rents and Location Sites | 8,497.50 | | | Subscribed—Not Issued: | | |
| Organization and Development | 35,000.00 | | | Preferred 8% Cumulative | 388,400.00 | |
| | 45,539.56 | 45,539.56 | | Common, No Par Value, 23,725 shares | .... | |
| | | | | Total Subscriptions | 388,400.00 | |
| **Other Assets:** | | | | Total Capital Stock | 850,410.00 | $850,410.00 |
| Concessions | $151,000.00 | | | **Surplus** | 33,780.46 | |
| Stock Subscription Contracts | 202,889.15 | | | Total Net Worth | 884,190.46 | 884,190.46 |
| | 353,889.15 | 353,889.15 | | | | |
| Total Assets | | $1,011,577.44 | | Total Liabilities & Net Worth | | $1,011,577.44." |

It will be noted that the surplus appearing on this balance sheet is $33,780.46, while but $10 is assigned as a liability to the 216,587 common shares outstanding. Of these 216,587 shares, 151,000 had been issued for a concession to use the name and process of selling of Clarence Saunders and for an option to purchase certain other stores. The option had not been exercised, and the entire value of $151,000 was entered as the asserted valuation of the Saunders concession. As to the remaining 65,587 shares, the record does not show for what amount they were sold, but the underlimit of their sale, as fixed by the Corporation Commissioner of Arizona, had been first $1; then $5; then $7.50.

Whatever the consideration for the common shares, it is apparent that before there could be a surplus on any proper accounting theory, at least the $33,780.46, treated as surplus, should have been attributed to the common shares outstanding. There was no basis for a surplus item.

If the jury believed Brandt's testimony, there was here competent evidence that the Greenbaums' letters affirming profit were written by them with knowledge that probably there was a loss. If this had been coupled with a proper showing of an actual loss, a verdict of guilt quite likely would have been rendered.

Brandt's testimony, however, was much shaken in other regards, and we cannot hold that the jury would have convicted on his evidence. Brandt was the principal witness for the prosecution. His good faith is questioned by a showing of his continuing to remain in the employ of the company, while claiming that all its successive dividends were paid in the absence of profitable operation. The jury could well have wondered why he was not indicted with the others. He was recalled seven times to fill in gaps in the case of the prosecution. He was peculiarly the character of witness requiring the exercise of the most extended freedom of the right of cross-examination.

124

Since Brandt claimed that the books showing the loss were truly kept and that no fictitious entries were made, and, further, that in the course of his corporate employment as bookkeeper he advised the Greenbaums that the books showed the loss, all supporting the theory of fraud in their statements that the company was running at a profit, the Greenbaums claimed the right to show both independent evidence and prior statements of Brandt to the effect that, in his corporate activities in the keeping of these same books, he had been guilty of gross dishonesty. That is to say, that they could show both inconsistency with his statements that they were truly kept by him and without fictitious entries and that his conduct was dishonest in the very transactions about which he was testifying.

We regard the claim as well founded. The proof of Brandt's dishonesty in keeping the books contradicts his prior statement that he kept them truly, and hence is logically relevant to the honesty of his testimony about the books. The latter was brought out on direct examination, and there exists a clear right, on cross-examination, to a full exploration of Brandt's integrity or lack of it as shown in his bookkeeping. Appellants claimed that an exploration would reveal such dishonesty, and their avowal consisted of an assertion of acts on the part of Brandt which would amount to an embezzlement. The court refused a full cross-examination relative to Brandt's integrity in the keeping of the books, and limited the showing to the fictitious as distinguished from the dishonest character of the entries. Its ruling seems to have been based on the theory that the evidence offered was incompetent because the claimed lack of integrity amounted to a crime which cannot be proved until a separate trial and conviction has been had.

Such a ruling involves the illogical conclusion that when the evidence, intrinsic in Brandt's corporate activity, becomes most convincing of his dishonesty, that is, most competent to show his dishonesty, it is held not competent. His dishonesty becomes buried in criminality and therefore unavailable to those presumed innocent, because an artifice of the law of evidence. This contention is disposed of in Moore v. United States, 150 U. S. 57, 61, 14 S. Ct. 26, 37 L. Ed. 996.

We hold that the refusal to permit the extension of Brandt's cross-examination is error and that appellants are not precluded from further questioning him be-

cause in seeking to show dishonesty they may show criminal dishonesty in his keeping of the books of account, upon whose figures appellants' conviction is sought. They are likewise entitled to impeach Brandt's credibility by proof of prior statements inconsistent with his testimony at the trial.

Appellants assign as error that the evidence connecting them with the mailing of the indictment letter (Gov. Ex. 43) was insufficient to warrant consideration by the jury. The letter, bearing the letterhead of the appellants' Bond & Mortgage Company, was addressed to Mrs. Addie Driscoll, was identified by her as having been received through the post office, and purported to be signed by Mrs. Loveland, the admitted agent of the company. Mrs. Driscoll further identified the envelope containing the letter in court to be the same as or "identical with" the envelope received by her.

Defendants objected to the offer of the letter in evidence upon the grounds that it did not tend to connect the Greenbaums with the offense charged, and that there was no adequate proof of mailing by the defendants. In their brief appellants urge that this objection included the specific objection that the signature of Mrs. Loveland to the missive was not properly identified. Assuming that the point was properly raised, it is, nevertheless, without merit. Several letters from the Bond & Mortgage Company, a few bearing the signature of Mrs. Loveland, directly identified by the witness Tom Brandt, were properly received in evidence to show various aspects of the alleged unlawful scheme. If the identified signature of Mrs. Loveland, closely resembling that on the indictment letter, was before the jury in connection with the other matters, it was proper to admit in evidence the signature on the indictment letter. Stokes v. United States, 157 U. S. 187, 194, 15 S. Ct. 617, 39 L. Ed. 667; 28 USCA § 638. It may be argued that the indictment letter was received in evidence prior to other missives which bore Mrs. Loveland's directly identified signature, and hence that the Stokes Case does not apply. Inasmuch as the necessary material was all introduced at approximately the same time, and inasmuch as it is nowhere seriously contended that the purported signature is not genuine, the error, if any, could not prejudice the defendants.

This brings us to the question of whether the evidence sufficiently showed a mailing of the indictment letter by the de-

fendants or their agents to warrant consideration by the jury. In addition to evidence of receipt through the mails, the letter bears the name of the company and was apparently posted from Phœnix, its place of business. The letter was signed with the company's name by the purported signature of M. Loveland, admitted secretary and agent of the Greenbaums. The mailing of a letter may be shown by circumstantial evidence only. A signature of an employee plus the company's letterhead, together with proof that the letter was mailed by some one, is sufficient in this respect. Cochran v. United States (C. C. A.) 41 F.(2d) 193, 205; Havener v. United States.(C. C. A.) 49 F.(2d) 196, 200; Levinson v. United States (C. C. A.) 5 F.(2d) 567, 569; Stephens v. United States (C. C. A. 9th) 41 F.(2d) 440, 447; McIntyre v. United States (C. C. A.) 49 F.(2d) 769; Cohen v. United States (C. C. A.) 50 F.(2d) 819, 821. The cases cited by appellants as demanding a different conclusion in this instance do, at their strongest, no more than hold that proof of receipt through the mails is not sufficient to charge the signer with the mailing of the incriminating letter in the absence of any further circumstantial evidence such as usage or letterheads. Freeman v. United States (C. C. A.) 20 F.(2d) 748, 750. There is no merit in this assignment of error.

As a further proof that the Stores Company was operating at a loss during the entire period in which the alleged false representations were made, the government introduced in evidence two income tax statements from the files of the office of the Internal Revenue Department for the District of Arizona. They were entries for the years 1929 and 1930, and were in the nature of local memoranda, showing that returns had been filed for the years in question, and purporting to indicate the pertinent facts under such returns. On the first of these there are two material items. One indicates a gross income for 1929 of $125,-588.45, a loss of $150,271.53, and a mark showing that no income tax for the year in question had been paid. A similar card for 1930 shows a gross income of $306,054.-21 and a loss of $135,626.67, plus a notation of no tax paid. Neither card is signed. Neither card indicates who made the return from which the card was purportedly computed.

Roy Davidson, Acting Collector of Internal Revenue for the district, testified that these cards were made in his office in the regular course of business; that they were copied from the returns on file in Washington. "We have merely a record of filing, by years, of corporations, showing their net income which we transcribe from the return," he said. He testified that he could tell by the handwriting on the cards who it was that made them out, but did not know of his own knowledge whether they were correctly transcribed from the return. Some doubt having arisen on the voir dire as to .whether Davidson was authorized to make the information contained on the cards public, the matter was adjourned until the following day, at which time the witness returned to court armed with a telegram purporting to have been sent by an agent of the Department of Internal Revenue in Washington, which telegram authorized Davidson "to testify in this case with reference to income tax return of States (sic) Company for the years 1929 and 1930." A. E. Sanders, erstwhile president of the ill-fated grocery chain, took the stand and waived any privilege he might have in the matter. Over omnibus objections on the part of the appellants, the cards were admitted in evidence and read to the jury. Appellants have duly assigned error.

 A proper ruling on this assignment requires, first, a consideration of a full income tax return as evidence of the true state of the company. A return is a statement by the taxpayer or by some one on his behalf, hence hearsay and only receivable in evidence as an admission. An admission is evidence against him who made it, or, under the proper circumstances, against his principal, coconspirator, or coadventurer. The fact that income tax returns are "public records" (Rev. Act 1926, §§ 257, 1115, 26 USCA § 1024 [26 USCA § 55 and note]) cannot lend them a greater evidentiary value than they intrinsically possess. In this respect a taxpayer's return differs from an assessment book showing facts gleaned from the observation of a public official in the regular course of duty, which facts may be proved by the book alone under the "public record" exception to the hearsay rule. Ronkendorff v. Taylor's Lessee, 4 Pet. 349, 360, 7 L. Ed. 882.

 Since the prosecution failed to show that the Greenbaums had any relationship with the accounting of the grocery business, even the original income tax returns would not be receivable as their admissions. However, on a new trial the prosecution may be able to supply the evidence

of their participancy, which it failed to produce in the first, and thus make the income tax returns pertinent as admissions.

An equally serious error committed in the reception of these cards was the inexplicable violation of the best evidence rule. The purported returns from which the cards were taken were made subject to sections 257, 1115, Revenue Act of 1926, which provides, in part: (26 USCA § 1024 [26 USCA § 55 and note]) "Returns upon which the tax has been determined by the Commissioner shall constitute public records. * * * Whenever a return is open to the inspection of any person a certified copy thereof shall, upon request, be furnished to such person under rules and regulations prescribed by the Commissioner with the approval of the Secretary."

Treasury Regulation 74, adopted pursuant to the above statute provides (section 422): "The original income return * * * or a copy thereof, may be furnished by the Commissioner to a United States attorney for use as evidence before a United States grand jury or in litigation in any court, where the United States is interested in the result. * * *"

28 USCA § 661 provides: "Copies of any books, records, papers, or other documents in any of the executive departments * * * shall be admitted in evidence equally with the originals thereof, when duly authenticated under the seal of such department."

■ The statutes have thus carefully outlined the procedure by which original returns or their certified copies may be made available in evidence. Failure to follow the same is a clear violation of the best evidence rule. Corliss v. United States (C. C. A.) 7 F.(2d) 455, 457. This court has twice indicated that the method provided is the proper one when an income tax return is material evidence in a criminal prosecution. Gibson v. United States (C. C. A.) 31 F. (2d) 19, certiorari denied 279 U. S. 866, 49 S. Ct. 481, 73 L. Ed. 1004; Lewis v. United States (C. C. A.) 38 F.(2d) 406, 413. The procedure has also received the sanction of the Seventh Circuit in a mail fraud case. Lewy v. United States (C. C. A.) 29 F.(2d) 462, 464, 62 A. L. R. 388, certiorari denied 279 U. S. 850, 49 S. Ct. 346, 73 L. Ed. 993.

The government seeks to avoid the effect of this mass of authority by the assertion that the cards offered in evidence were "public records," and that hence, in some manner, any and every violation of the law of evidence committed in their introduction magically vanishes.

■ There can be no doubt that official records kept by persons in public office, which records are required to be kept either by statute or by the nature of the office, are admissible to prove transactions occurring in the course of official duties, within the personal observation of the official recording the transactions, without any further guarantee of their accuracy. Salte v. Thomas, 3 Bos. & P. 188, 189; Ronkendorff v. Taylor's Lessee, 4 Pet. 349, 360, 7 L. Ed. 882; Evanston v. Gunn, 99 U. S. 660, 665, 25 L. Ed. 306; White v. United States, 164 U. S. 100, 102, 17 S. Ct. 38, 41 L. Ed. 365; Heike v. United States (C. C. A.) 192 F. 83, 94; Demeter v. United States, 62 App. D. C. 208, 66 F.(2d) 188, 189; United States v. Mid-Continent Petroleum Corporation (C. C. A.) 67 F.(2d) 37, 44.

Assuming that the cards introduced in evidence in this cause were public records within the meaning of the above cases, that conclusion does not cure the violations of the hearsay and best evidence rules discussed above. Giving them the full import of the public record rule is merely to conclude that the figures on the card were accurately transcribed from an income tax return in Washington. It throws no light on who signed the original return, hence makes the original return no less inadmissible hearsay. The public nature of these cards may vitiate hearsay in the transcription, but it cannot vitiate hearsay in what is transcribed. The fact that a record is public adds nothing to what is recorded. Mohawk Condensed Milk Co. v. United States (Ct. Cl.) 48 F.(2d) 682, 685. In this view of the matter it is unnecessary to decide whether the cards would have been admissible had they contained references indicating who made out the original returns. Were such the case, it would be necessary to inquire whether the inspection and transcription of the original return by an officer of the Arizona district, in the regular course of duty, was the recording of a transaction within the personal observation of the recording official, within the meaning of the rule as laid down by the Supreme Court cases cited above.

Nor can it be said that the best evidence rule, as applied to tax returns in mail fraud cases in Corliss v. United States, supra, is to be relaxed or overthrown if the secon-

dary evidence of the contents of a document, otherwise inadmissible, happens to consist of public records. Salte v. Thomas, supra.

It can hardly be contended that the error thus committed was not prejudicial. Defendants had opportunity to cross-examine neither the unknown person who made the original return nor the person who transcribed the purported entries therefrom. They were without means to obtain the original return or a copy thereof by which they might have shown facts offsetting or qualifying the damaging import of the cards. The jury may well have based its belief in the financial unsoundness of the Stores Company on these cards alone, dignified as they were by the aura of officialdom which accompanied them. After the highly involved and technical nature of Accountant Null's evidence, such a brief and clear statement of an essential fact in the government's case as these cards provided must have been to the jury at once both refreshing and conclusive.

Reversed.

On Petition for Rehearing.

PER CURIAM.

The petition is in error in suggesting that the opinion forecloses all inquiry relative to falsity of representations as to Saunders' "guiding hand." That the so-called Clarence Saunders' "concession" from the company of his name and of which he was president was transferred to the Stores Company is proved by the application to the corporation commission for a permit to purchase the license for certain shares, the granting of the permit, the issuance of the shares, and the appearance of the license as an asset in the Stores Company accounts—all shown by documents and other evidence of the appellee. Appellee's brief urges that the concession valued as an asset at $151,000 on the Stores Company's balance sheet is "valueless," not that it is not an asset. The burden was on the appellee to show that conforming in all, or even in part, of the requirements or advice given pursuant to this concession from the company of which he was president did not constitute Saunders' guidance. We held this burden not sustained by the evidence offered. This does not prevent other and fuller evidence, if such there be, on this question in a new trial.

Petition denied.