**GREENBAUM et al. v. UNITED STATES.**
**No. 8739.**

Circuit Court of Appeals, Ninth Circuit.

Aug. 10, 1938.

Alexander B. Baker, Louis B. Whitney, and Lawrence L. Howe, all of Phoenix, Ariz., for appellants.

F. E. Flynn, U. S. Atty., of Phoenix, Ariz., and John P. Dougherty, Asst. U. S. Atty., of Tucson, Ariz.

Irving M. Walker and Herman F. Selvin, both of Los Angeles, Cal., amici curiæ.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

A. E. Sanders, of wide experience in the grocery business, was operating a Piggly-Wiggly system grocery store in Nogales, Arizona, in 1922. The store had been opened as a partnership and, after a few years, the partnership was dissolved and a corporation formed, A. E. and his brother, H. D. Sanders, owning all of the stock. The Piggly-Wiggly system of merchandising foodstuffs was originated by one Clarence Saunders of Memphis, Tennessee. A. E. Sanders procured a franchise to do business under that system in Santa Cruz County, Arizona, and purchased his fixtures from that company, also paying a ½ of 1% royalty on gross sales for the use of the name Piggly-Wiggly. Later he obtained an additional franchise to do business in Willcox and Tombstone, Arizona. During part of 1927 and 1928 he personally sold some stock in his corporation, intending to form a chain of grocery stores. In June or July of 1928 a Mr. Gribben of Denver, Colorado, wrote him that the Greenbaum brothers, appellants here, had just completed a stock selling agreement for the Piggly-Wiggly stores in that vicinity. Sanders answered that he was interested and Gribben visited him and, later, the Greenbaums came to Nogales. Sanders advanced $250 to each of the three Greenbaums and they commenced selling stock in the company. Over $100,000 in stock was sold, preferred and common, and stores were opened in Willcox and Tombstone. Clarence Saunders of Memphis, Tenn., was no longer connected with Piggly-Wiggly and had devised another and slightly different system for merchandising groceries, called Clarence Saunders Sole Owner of My Name stores. Will Greenbaum discussed

this new system with A. E. Sanders, as having been suggested to him by some of the stockholders. Sanders desired further expansion but could not secure more territory from Piggly-Wiggly, so he decided to procure a franchise for the Territory from the Clarence Saunders Sole Owner of My Name Company.

Accompanied by his wife, Sanders went to Memphis, Tenn., in October, 1928, and secured a franchise from Clarence Saunders to operate "My Name" stores in Arizona and New Mexico. Thereafter, he caused the Clarence Saunders Stores, Inc., to be incorporated, but this name did not meet with the approval of the licensor corporation, so the word "Arizona" was added as a prefix, the name becoming, Arizona Clarence Saunders Stores, Inc. Throughout the remainder of the opinion this corporation, which changed its name three times, will be referred to as the Stores Company. Sanders transferred to this corporation the franchise to operate My Name stores and an option on Cash-Way stores in Tucson, Arizona, for 151,-000 shares of common stock of no par value.

On December 20, 1928, the Stores Company entered into an agreement with the Greenbaum brothers granting the exclusive right for a period of two years to sell 15,000 shares of preferred stock and not less than 149,000 shares of common stock, for a commission of 20%. It was further provided by the agreement that the 20% commission should not be paid until at least 40% of the principal amount of a subscription was received by the Stores Company and the Stores Company then assumed collection of the balance. This arrangement was adhered to. On the same day another or supplementary agreement was entered into between A. E. Sanders and Greenbaum Brothers, whereby Sanders agreed to transfer not to exceed 20,000 shares of his own stock in the Stores Company to the Greenbaums as an incentive to them to promptly fulfill the sales agreement, 5,000 shares for each $100,000 in subscriptions secured. Following the execution of this contract the Greenbaums established offices in Phoenix and Tucson, Arizona, and commenced selling stock. At the end of 1929 the Greenbaums organized the Bond and Mortgage Corporation to carry on their operations, and on December 3, 1929, an "Option Agreement" was entered into between the Stores Company and the Bond and Mortgage Corporation modifying the original stock sales agreement. This agreement granted the latter the exclusive right, at its option, to purchase a specified number of shares of preferred and common stock at reduced prices (approximately 20%); so that the Bond and Mortgage Corporation could sell stock at the listed market price or par, and pay the Stores Company the reduced price, requesting delivery to the third party, retaining the balance.

Sanders said that over $800,000 was raised by the Greenbaums through stock selling, and paid over to the Stores Company. Permits were granted the Stores Company by the Arizona Corporation Commission to sell stock, the preferred at $100 per share and the common at advancing prices, first at $1 a share, then $5, $7.50, and, finally, $10.

The license agreement with the Clarence Saunders Corporation required the Stores Company to establish one store every thirty days after January 1, 1929, until a total of 25 were opened and operating. Twenty-two stores were actually opened in Arizona by the Stores Company.

Sanders testified that he was "sold" on the idea of operating chain stores under the franchise and believed he could operate the Stores Company successfully. The business did not prove profitable, for one reason or another, and eventually found its way into the hands of receivers.

The appellants, together with A. E. Sanders and H. D. Sanders, were indicted February 28, 1933, for "Use of United States Mails in furtherance of a scheme to defraud (Violation of 18 U.S.C.A. § 338)." Defendant H. D. Sanders was not apprehended; defendant A. E. Sanders at first pleaded not guilty, but, during the trial withdrew his plea of not guilty and entered a plea of nolo contendere. The other defendants pleaded not guilty. Demurrer was sustained as to counts 2 to 17 of the indictment and the case went to trial on count 1, resulting in verdicts of guilty against the Greenbaums. Upon appeal the judgment was reversed for errors occurring at the trial. 9 Cir., 80 F.2d 113. A second trial resulted in a hung jury. The third trial resulted in judgments of guilty against the three defendants, William Greenbaum, Charles Greenbaum, and Gus B. Greenbaum. The defendants appeal to this court, assigning thirty-six separate errors, divided into eleven points in their

opening brief. In our view of the case, it becomes necessary to consider only one of these questions.

Certain exhibits numbered 41 to 47, inclusive, were separately offered in evidence by the Government, and received. The appellants objected to each exhibit on "grounds that no proper foundation had been laid; that it had not been properly identified; that it had not been shown that the entries appearing in the exhibit were either original entries or the first permanent entries of the transactions; that there had been no attempt to produce the persons who made the original entries, nor the persons having knowledge of the facts, said entries were not corroborated by any person having personal knowledge of the facts, and that there had been no showing that such persons were dead, insane or beyond the reach of process; that as to the defendants Greenbaum there had been no showing that they had any control whatever over the bookkeeping system of the Saunders Stores; nor had there been any showing that the Stores Company was the agent of the Greenbaums, therefore, each and every of said exhibits was pure hearsay and incompetent evidence as to the Greenbaums." "The defendants further objected separately to each of said Exhibits, if the Act of Congress of June 20, 1936 [49 Stat. 1561-1564] (Sec. 695 et seq., Title 28, U.S.C.A.) was sought to be applied, upon the grounds: First: That no proper foundation had been laid under Section 695. Second: That by the terms of Section 695h, it is provided that the Act 'shall be prospective only and not retroactive.' Third: Upon the grounds that every act was presumed to be prospective and not retroactive. Fourth: Upon the grounds that this case must be retried under the rules of law laid down by the Circuit Court of Appeals in the case of Greenbaum v. U. S., 9 Cir., 80 F.2d 113. Fifth: Upon the grounds that this particular Act, if it was sought to apply it to the trial of this case, would be ex post facto and a violation of the Federal Constitution in that it would alter the legal rules of evidence and receive less or different testimony than the law required at the time the alleged commission of the alleged offense in order to convict the defendants, and further, defendants would be denied due process of law; * * *."

The defendants' objections were overruled, and the exhibits received in evidence, the defendants noting exceptions to the ruling and to the exhibits.

Exhibit No. 41 was a General Ledger containing items posted from other books, without detail; Exhibit 42 was a journal containing entries from February, 1929, to February, 1931, without detail; Exhibit 43, a Cash Receipts Book containing entries from January, 1929, to August, 1930, without detail; Exhibit 44, Records of Checks Drawn and Distribution of Expenses, with name of payee and amount but purpose for which drawn not shown, from January, 1929, to March, 1931; Exhibit 45, a Stock Subscription Journal containing entries from January 8, 1929, to July 16, 1930, covering "Record of Journal Entries," "Record of Stock Sales," and "Record of Stock Subscriptions"; Exhibit 46, Invoice Register No. 3, covering purchases of merchandise; and Exhibit 47, Record of Warehouse Sales, merchandise delivered from the warehouse to the stores.

Each of these exhibits was presented to A. E. Sanders while he was on the witness stand. He identified the books, testifying generally as to the source of the entries and the purpose thereof; said that he made no entries in the books, although they were under his supervision; and that he instructed some of the bookkeepers to make entries. He said that Exhibit 41 was kept in the regular order of business and that Exhibits 41, 42, 43 and 44 were permanent records of the corporation. On cross-examination he stated that these books (Exhibits 41–47, inclusive) were kept under his supervision, but he had never worked on them or examined them to test their correctness; that he did not know whether these books constituted all of the books of the corporation.

E. B. Horne, Vice President and Secretary of the Stores Company at the time of organization, who installed the accounting system, appearing as a witness, identified Exhibits 41 to 47, inclusive, and stated that he knew the nature and source of the entries and that he had made some of them.

G. C. Partee, who was in the employ of the Stores Company in 1930 and 1931, as auditor and later, Secretary and Treasurer thereof, identified the books and said that he had made entries in them. To the same effect was the testimony of witness Willis M. Dent, as to Exhibit 43; that of Frank Cottrell; Freida Earhart; Beatrice Dooley; C. V. Crowley; and Gladys Gould.

After the prosecution had rested, counsel for the defendants moved the court, as follows: "If the Court pleases, the defendants separately move this Court to enter an order striking the following exhibits from the files, upon the grounds hereinafter stated. Inasmuch as Mr. Flynn offered Government's Exhibits Nos. 41 to 47, one after the other, and we were permitted to object to them separately, we now move, separately, to strike Government's Exhibits Nos. 41 to 47, being some of the books of account of the Stores Company, upon the grounds that no foundation has been laid for their introduction; no proper identification has been made of the books or the entries therein; that there has been no showing that the Greenbaums, or any of them, had any supervision or anything to do whatever with the bookkeeping system of the Clarence Saunders Stores; that they are not the best evidence, and as to the Greenbaums, they are all hearsay." The motion was denied and an exception noted.

Thereafter, a motion for directed verdict was made in behalf of defendants, which was denied and an exception noted. The defendants presented no evidence, but rested their case on the presentation by the prosecution.

The appellants contend that "The court erred in admitting in evidence Government's Exhibits 41 to 47, inclusive, being certain books of account of the Stores Company, for the reason that no foundation had been laid for their introduction and that they were hearsay as to the appellants, and that the Act of Congress of June 20, 1936 (Section 695, Title 28, U.S. C.A.[1]) was not applicable on the retrial of this case."

The appellee urges, in support of the judgment and in contravention of the contention of the appellants on this point, that if the jury believed Sanders' testimony there was competent evidence that the Greenbaums' letters affirming profit were written by them with knowledge that there probably was a loss and that, in order to support the verdict, it only remained to prove the falsity of appellants' representations and that books and records are competent to prove this fact.

Judge Mathews, speaking for this court in Wilkes et al. v. U. S., 9 Cir., 80 F.2d 285, 290, stated the rule as follows:

"The general rule is that, before the books of a corporation can be received in evidence against a defendant other than the corporation itself, the entries therein must be shown to have been made by persons having knowledge of the facts, and must be corroborated by their testimony, if living and accessible, or by proof of their hand writing, if dead, insane, or beyond the reach of process. [Cases cited.]

"The rule was not complied with in this case. · It was not shown that the persons who made the entries here in question had any knowledge of the facts to which they related. Many of the entries were not proved or corroborated by the testimony of the persons who made them. No reason was shown for not calling these entrants as witnesses. Those who were called testified merely to the making of certain entries. They did not pretend to have any knowledge of the transactions referred to. The showing made was, under the general rule, clearly insufficient.

"There is, however, an exception to the rule where the corporation whose books are offered in evidence is shown to have been dominated and controlled by the defendant against whom they are offered. [Cases cited] * * *."

In Greenbaum v. U. S., 9 Cir., 80 F. 2d 113, 121, we said, "In an opinion of Judge Rudkin, the court has stated the rule to be, where books of account are

---

[1] 28 U.S.C.A. § 695 (49 Stat. 1561):
"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation, and calling of every kind."

28 U.S.C.A. § 695h (49 Stat. 1564):
"Sections 695 to 695h of this title shall be prospective only, and not retroactive."

offered as evidence against one not a party chargeable with an interest in their keeping, that: 'In order to lay the foundation for the admission of such evidence it must be shown that * * * the entries [in the books] were either original entries or the first permanent entries of the transactions.' Osborne v. United States (C.C.A.) 17 F.2d 246, 248, certiorari denied 274 U.S. 751, 47 S.Ct. 765, 71 L.Ed. 1332."

 As a general rule, and in the absence of statute, unless it can be shown that the entries in the books sought to be introduced in evidence against one not a party chargeable with an interest in their keeping were either original entries or the first permanent entries of the transactions and kept in the regular course of business, the books are not admissible, as within the "hearsay" rule.

It cannot be contended that these books contained the original entries or even that some of them contained the first permanent entries of the transactions represented; they were, however, undoubtedly kept in the regular course of business, and admissible under 28 U.S.C.A. § 695, unless that section is qualified by Section 695h. The indictment was found February 28, 1933, and our opinion upon the first appeal was filed October 28, 1935; the indictment letter to Addie Driscoll was mailed April 9, 1930, while the statute under which it is claimed the books were admissible was not enacted until June 20, 1936.

Tested by Greenbaum v. U. S., and Wilkes v. U. S., supra, the Exhibits 41 to 47, inclusive, were patently inadmissible if the Act of June 20, 1936, did not apply, and their receipt in evidence was prejudicial error.

We have not the slightest doubt but that the statute in question was passed for the specific purpose of changing the general rule of evidence hereinabove set forth. With the wisdom or authority of the act of the legislative body we are not here concerned; in the present circumstances we have not the right to inquire into the constitutionality of the enactment, nor is it the part of judicial discretion to argue advisability. By its very terms, the Act of June 20, 1936, is not applicable and, therefore, the books of account, Exhibits Nos. 41 to 47, inclusive, were inadmissible. Valli v. U. S., 1 Cir., 94 F.2d 687, 693.

We are cited to Hass v. U. S., 8 Cir., 93 F.2d 427, 437, by the appellee. This case says, "The provision of the act which prevents a retroactive application did not make the act inapplicable at the time this case was tried," although the indictment had been returned prior to the passage of the Act. We have made an earnest study of the Hass Case and of the Act and are unable to understand Section 695h to mean anything other than "Sections 695 to 695h of this title shall be prospective only, and not retroactive."

For error in the admission of these books in evidence, the judgment of the court below is reversed, and cause remanded.